Present: Judges Humphreys, Beales and Senior Judge Clements
Argued at Richmond, Virginia

UNPUBLISHED

WILLIAM EDWARD TUMA

v.     Record No. 0919-10-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE JEAN HARRISON CLEMENTS
SEPTEMBER 24, 2013

UPON REMAND FROM THE SUPREME COURT OF VIRGINIA

FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
Thomas V. Warren, Judge

Linwood T. Wells, III, for appellant.

Craig W. Stallard, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


William Edward Tuma was convicted following a jury trial of taking indecent liberties with

a child, aggravated sexual battery, and animate object sexual penetration. This case returns to us on

remand from the Virginia Supreme Court "to address Tuma's second assignment of error in which

he challenged the trial court's denial of his request to admit the tape into evidence," an evidentiary

ruling. Commonwealth v. Tuma, 285 Va. 629, 639, 740 S.E.2d 14, 20 (2013).

In Tuma v. Commonwealth, 60 Va. App. 273, 726 S.E.2d 365 (2012) (en banc), noting that

"[t]he trial court did not admit the audio tape into evidence because Tuma had not listened to the

tape and did not know what was on the tape at the time he asked the trial court to admit it into

evidence and to play it for the jury," we concluded we need not address Tuma's second assignment

of error as "[o]ur resolution of the first assignment of error is dispositive of our ultimate holding

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

reversing Tuma's convictions . . . ." Id. at 303-04, 726 S.E.2d at 380, rev'd, 285 Va. at 632, 726

S.E.2d at 16.  Having now reviewed Tuma's second assignment of error, as directed by the Supreme

Court, we find it meritless and therefore affirm the trial court's ruling and Tuma's convictions.  We

also remand the matter to the trial court for the limited purpose of correcting a clerical error in the

sentencing order.[1]

Background

Tuma was accused of sexually molesting his stepdaughter, L.S., beginning when the child

was five years old.  She eventually reported the incidents, and on February 6, 2008, Jon Webster

Scheid, a Department of Social Services supervisor, and Dinwiddie Sheriff's Office Investigator

Dwayne Gilliam interviewed the victim.  Investigator Gilliam indicated to Tuma's counsel prior

to trial that he believed the interview with the child may have been recorded, and Scheid

confirmed during the trial that there was indeed an audiotape of that interview.

Although the Commonwealth provided defense counsel with a written summary of the

initial interview, prior to trial, the Commonwealth did not provide counsel with the actual

recording.  Tuma's counsel did not actually acquire the tape until after trial, at which time he

moved for a new trial based on an alleged Brady violation.

---

[1] According to its sentencing order entered on April 22, 2010, Tuma was convicted of
(1) indecent liberties, see Code § 18.2-370.1, (2) aggravated sexual battery, see Code
§ 18.2-67.3(A)(1), and (3) animate object sexual penetration, see Code § 18.2-67.2.  The
sentencing order states that appellant's sentence for aggravated sexual battery was 25 years —
which is greater than the statutory maximum of 20 years of imprisonment for an aggravated
sexual battery conviction.  However, it is clear from the trial transcript that the jury
recommended a 25-year sentence for animate object sexual penetration (which is within the
statutory maximum of life in prison) — not for aggravated sexual battery (for which the jury
recommended a 5-year sentence).  It is also clear from the trial transcript that the trial judge
sentenced appellant in accordance with the jury's recommendations.  Thus, the trial court's final
order simply reverses appellant's sentences for aggravated sexual battery and for animate object
sexual penetration.  Therefore, we remand the matter to the trial court for the specific purpose of
correcting this clerical error.

Both Scheid and Gilliam testified at trial and, after having reviewed their notes, indicated that the contents of the recording comported with the summary provided to the defense. They also testified about their interview with the victim and were subject to cross-examination by defense counsel. The victim, as well, testified at trial and recounted the interview. Tuma sought to have the tape played at trial, but the trial court denied his request.

Analysis

On appeal, Tuma initially argued the trial court erred by ruling "that the evidence discovered by the defense during the jury trial, an audiotape, was not exculpatory in nature and therefore need not have been disclosed by the Commonwealth prior to trial pursuant to Brady v. Maryland," 373 U.S. 83 (1963). As noted, the Supreme Court reversed this Court and concluded "the Commonwealth committed no Brady violation, as the recording was made available to Tuma in sufficient time for its use at trial . . . ." Tuma, 285 Va. at 632, 740 S.E.2d at 16.

Tuma's second assignment of error stated the trial court erred by "refusing to allow the jury to hear the tape and admit it into evidence." Specifically, he asserts "[t]he audio tape recording was clearly relevant and the court abused its discretion and committed error by not introducing it."

Preliminarily, we note that at trial, Tuma sought to play the tape before the jury arguing only that "it is the best evidence in the case in terms of what the child said on that audio tape."

"The Court of Appeals will not consider an argument on appeal which was not presented to the trial court." Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998). See Rule 5A:18. We will not consider an argument on appeal that is different from the specific argument presented to the trial court, even if it relates to the same issue. See Buck v. Commonwealth, 247 Va. 449, 452-53, 443 S.E.2d 414, 416 (1994) (holding that appellant's failure to raise the same specific arguments "before the trial court precludes him from raising

- 3 -

them for the first time on appeal"). Thus, Rule 5A:18 bars our consideration of any but the best evidence argument Tuma presented to the trial court.

> Although Rule 5A:18 allows exceptions for good cause or to meet the ends of justice, appellant does not argue that we should invoke these exceptions. See e.g., Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) ("In order to avail oneself of the exception, a *defendant must affirmatively show* that a miscarriage of justice has occurred, not that a miscarriage might have occurred." (emphasis added)). We will not consider, *sua sponte*, a "miscarriage of justice" argument under Rule 5A:18.

Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*).

In Brown v. Commonwealth, 54 Va. App. 107, 676 S.E.2d 326 (2009), we held that the best evidence rule applies only to writings, and concluded videotapes are not writings for the purposes of the rule. Id. at 115-17, 676 S.E.2d at 329-30. "Because we decline to expand the scope of the best evidence rule, we hold that the trial court did not abuse its discretion by admitting [the witness'] testimony describing the contents of the surveillance videotape." Id. at 118, 676 S.E.2d at 331. Similarly, in this case, Tuma sought to introduce the audiotape of the initial interview, arguing it was the "best evidence" of what was said at the time. Instead, the Commonwealth introduced the evidence through the testimony of the victim and the two interviewers. As in Brown, because the audiotape is not a writing for purposes of the best evidence rule, we find no abuse of discretion with the trial court's decision not to admit the tape.

Furthermore, we note that "'[t]he admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion.'" Bell v. Commonwealth, 49 Va. App. 570, 576, 643 S.E.2d 497, 500 (2007) (quoting Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988)).

Neither Tuma's counsel nor the attorney for the Commonwealth had listened to the tape recording at the time Tuma requested that it be played for the jury. Thus, not knowing the actual content of the recording, the trial court was unable to determine whether the evidence was

- 4 -

relevant and admissible. The trial judge specifically admonished counsel, noting "[y]ou haven't heard it. So we'll not just play a tape and run this thing sort of off beat, off horse back without any sort of thought or notion as to what is there." Later, the trial judge also emphasized that "I don't think you are entitled just to play something because you think it may be exculpatory or there may be something in there . . . slightly inconsistent . . . ." Although addressing the admissibility of a videotape, we believe the following language from Brooks v. Commonwealth, 15 Va. App. 407, 410, 424 S.E.2d 566, 569 (1992), is applicable: "Before asking the court to admit a videotape into evidence . . . the party offering it must authenticate it and show that it is relevant."

Instead of asking the trial court for permission to listen to the recording, Tuma's counsel simply moved to admit the entire recorded interview into evidence. It is well settled that to impeach a witness by a prior inconsistent statement, the foundation should be laid by first calling the attention of the witness to the alleged inconsistent statement and inquiring whether he made it. Via v. Commonwealth, 42 Va. App. 164, 185, 590 S.E.2d 583, 593 (2004). Therefore, as Tuma had not reviewed the evidence at the time he sought to introduce it, he was unable to lay any foundation to support its introduction. The trial judge correctly refused to admit the tape into evidence under such circumstances.

Accordingly, the judgment of the trial court is affirmed and we remand the matter to the trial court for the sole purpose of correcting the sentencing order to reflect that appellant's sentence for aggravated sexual battery is five years and his sentence for animate object sexual penetration is twenty-five years.

Affirmed and remanded.

- 5 -

Humphreys, J., concurring.

I join completely in the analysis and judgment of my colleagues on the issue before us on remand from the Supreme Court of Virginia as a result of its decision in Commonwealth v. Tuma, 285 Va. 629, 740 S.E.2d 14 (2013). I write separately only to observe the dilemma now created for this Court and the trial courts of the Commonwealth by our Supreme Court's decision regarding the other assignment of error in that case.

Before the Supreme Court the Commonwealth did not challenge whether the audiotape of the victim's interview with Investigator Gilliam and social worker Scheid was exculpatory within the meaning of Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. There is no question that the tape contained evidence that could have been used to potentially impeach the credibility of the seven-year-old victim, Investigator Gilliam, and Ms. Scheid. Indeed, the Supreme Court majority aptly noted that "Brady is 'a disclosure rule, not a discovery rule.'" Tuma, 285 Va. at 635, 740 S.E.2d at 18 (quoting United States v. Higgins, 75 F.3d 332, 335 (7th Cir. 1996)).

Nevertheless, despite its lip service to the concept that the prosecutor in a criminal case has an ongoing constitutional obligation to learn of and affirmatively disclose such evidence to the accused, our Supreme Court concluded "the Commonwealth committed no Brady violation, as the recording was made available to Tuma in sufficient time for its use at trial . . . ." Id. at 632, 740 S.E.2d at 16. Our Supreme Court reached this conclusion despite the fact that the record clearly reflects that the prosecutor, not only failed in her Brady duty to learn of the tape's existence, but also in her duty to produce the tape at any point before, during, or after trial. All this while repeatedly denying that an audiotape she never listened to was exculpatory in the first place, thereby forcing the appellant to seek post-trial relief from the trial court to get actual

access to a tape that Brady required the prosecutor to deliver to Tuma's counsel as soon as its exculpatory nature was apparent.

Thus, Tuma now stands for the proposition that a prosecutor in possession of exculpatory evidence who does nothing more than state that "He can listen to it if he wants to," without taking any steps whatsoever to actually make the tape available or otherwise affirmatively disclose its contents, has satisfied her obligation under Brady. As the Supreme Court dissenters point out, the majority "ignores the fact that the burden of production of exculpatory evidence falls on the prosecution." Id. at 646, 740 S.E.2d at 24.

The suppression by the prosecution of evidence favorable to the defendant "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Even an accused child molester is entitled to a fair trial. Implicit in the Supreme Court's majority opinion is the conclusion that any failure to receive a fair trial is the fault of Tuma for failing to seek immediate relief from the trial court. This conclusion stands in stark contrast to Brady and its progeny, which places both the responsibility to disclose exculpatory evidence and the consequences for failure to do so, on the prosecution and not the defendant. Those men and women who have the honor of representing the interests of the people of the Commonwealth and their communities in criminal cases should be ever mindful of their special obligations to seek fairness and justice in the criminal proceedings they institute that attend their unique position among legal professionals. Our adversary system of justice ought not continue to descend to a gladiatorial level unmitigated by any prosecutorial obligation for fairness and a search for the truth.

In my view, this Court and the trial courts are now faced with the dilemma of irreconcilable conflict on this point between the jurisprudence of the Commonwealth as annunciated by our Supreme Court with that of the Supreme Court of the United States as

annunciated in <u>Brady</u> and in <u>Kyles v. Whitley</u>, 514 U.S. 419, 437-38 (1995) ("[T]he *prosecution*'*s* responsibility for failing to disclose known, favorable evidence rising to a material level of importance is *inescapable*." (emphasis added)).

COURT OF APPEALS OF VIRGINIA


Present:   Chief Judge Felton, Judges Elder, Frank, Humphreys, Kelsey, Petty, Beales, Alston
            and Huff
Argued at Richmond, Virginia


WILLIAM EDWARD TUMA
                                                           OPINION BY
v.        Record No. 0919-10-2                   JUDGE ROBERT J. HUMPHREYS
                                                            JUNE 12, 2012
COMMONWEALTH OF VIRGINIA


UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
Thomas V. Warren, Judge Designate

Linwood T. Wells, III, for appellant.

Craig W. Stallard, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


        A jury convicted William Edward Tuma ("Tuma") in the Circuit Court of Dinwiddie

County ("trial court") of taking indecent liberties with a child, aggravated sexual battery, and

animate object sexual penetration.  On appeal, Tuma contends that the trial court erred by

1) ruling "on several occasions, during the jury trial and prior to sentencing, that the evidence

discovered by [Tuma] during the jury trial, an audio tape, was not exculpatory in nature, and

therefore need not have been disclosed by the Commonwealth prior to trial, pursuant to Brady v.

Maryland," 373 U.S. 83 (1963), and 2) "refusing to allow the jury to hear the audio tape and

admit it into evidence."  A panel majority of this Court reversed Tuma's convictions.  We

granted the Commonwealth's petition for rehearing *en banc* and stayed the mandate of the panel

decision.

I.  Background

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)).  So viewed, the facts establish the following.

In early February 2008, L.S., a five-year-old girl, told her stepmother and biological father that Tuma, her stepfather, had touched her inappropriately.  A joint investigation by police investigators and the Dinwiddie County Department of Social Services (Dinwiddie DSS) ensued which led to Tuma's indictment on the three charges for which he was later convicted by a jury. Prior to trial, Tuma's counsel filed a motion for discovery which included a request for "[a]ny other information or evidence known to the Commonwealth which is or may be exculpatory."

At trial on January 12, 2009, L.S. testified that Tuma assaulted her when she lived in the "house next to horses."  She specifically stated that Tuma touched her in her "bottom privates" and that it usually happened in Tuma's room after they watched movies that they should not have been watching because they included "[p]eople touching each other on their privates."  L.S. testified that Debra Tuma, her mother, was also in the room when the movies were on, but that she would leave the room once the movies were finished.  L.S. then stated that once Debra Tuma left the room, Tuma would tell her to take her clothes off and lie on the bed.  L.S. stated that he would touch her only in her "down" private parts, that he would put his fingers on and inside of her more than once, and that she could feel his fingers inside of her.  L.S. could not recall how many times Tuma touched her when she lived in the house near the horses, but testified that it was "a lot."  L.S. also testified that the sexual assaults sometimes took place in her bedroom. L.S. further testified that Tuma told her to touch her brother, who was three or four years old, when he was in the bathtub in "his down privates" while Tuma watched.  At some point while

the abuse was ongoing, Tuma, Debra, and L.S. moved from the house with the horses into an RV park. Prior to Christmas of 2007, L.S. went to live with her biological father and stepmother, but Debra Tuma still had visitation with L.S. The last time Tuma touched L.S. was around Christmas of 2007 in Tuma's bedroom when she was visiting her mother at the trailer.

On cross-examination, L.S. testified that she lived with her grandmother at one point and that Tuma also touched her there, but she could not remember the number of times it occurred. L.S. also replied on cross-examination that Tuma touched her more than ten times in the house with horses. L.S. further stated that Tuma touched her about three times a week at the "RV park."

When she lived with her biological father, L.S. inappropriately touched her male nephew. It was after the incident with her nephew that L.S. told her stepmother and biological father what Tuma had been doing to her and what he made her do to her brother.

Ms. Jon Scheid of Dinwiddie DSS and Sheriff's Department Investigator Dwayne Gilliam interviewed L.S. regarding L.S.'s allegations against Tuma. Investigator Gilliam testified at trial that L.S. reported during the interview that Tuma had "been touching her inappropriately for a period of time" and that the abuse occurred at two locations, one of which was Green Acres Trailer Park. An investigation was initiated based on this report, and the alleged assaults were determined to have occurred in Dinwiddie at 9617 Boydton Plank Road (L.S. refers to this location in her statement and testimony as "the house with the horses"), and 7901 Lot 36 Boydton Plank Road at Green Acres Trailer Park. Tuma was then arrested and charged with animate object penetration, aggravated sexual battery, and indecent liberties with a minor. On cross-examination, Investigator Gilliam testified that he believed the interview with L.S., Ms. Scheid, and himself may have been recorded on an audio tape, but he did not know if a transcript was ever made from the tape.

Ms. Scheid testified at trial that she had recorded the interview with L.S. and Investigator Gilliam and she had the audio tape in her possession; she stated that the recording was about thirty to forty minutes in length.[1] Ms. Scheid further testified that L.S. stated in the interview that the sexual abuse occurred at two locations, with the majority of incidents occurring at the house with the horses and one incident occurring at a residence in Green Acres Trailer Park. Ms. Scheid also stated that the tape included L.S.'s reference to the one incident at the trailer park. Upon discovering that Ms. Scheid had the tape in her possession, Tuma's counsel asked the trial court to play the audio tape. The Commonwealth objected, and the following colloquy took place:

| | |
|---|---|
| THE COURT: | Have you heard it? |
| [TUMA'S COUNSEL]: | No, sir. |
| THE COURT: | I am not going to play it. You can go listen to it if you want on your own time. We are not going to just - - I don't know what is there. We don't know what is in there. We will not just play a tape. You have already asked her about what was said. |
| [TUMA'S COUNSEL]: | Well, the argument is that it is the best evidence in the case in terms of what the child said on that audio tape. |
| THE COURT: | I don't think it is the best evidence in the case. It might be some evidence. You can take it off and listen to it. Has |

---

[1] The Virginia Administrative Code requires that most such interviews be recorded. 22 VAC 40-705-80(B)(1) provides in pertinent part: "The child protective services worker shall conduct a face-to-face interview with and observation of the alleged victim child and siblings. All interviews with alleged victim children must be electronically recorded [except in certain circumstances, none of which are applicable here]."

|                              |                                                                 |
| ---------------------------- | --------------------------------------------------------------- |
|                              | this been denied to [Tuma's counsel], this tape?                |
| [COMMONWEALTH'S ATTORNEY]:   | No, sir.                                                         |
| THE COURT:                   | He had access to it?                                             |
| [COMMONWEALTH'S ATTORNEY]:   | He can listen to it if he wants to.                             |
| THE COURT:                   | We'll not play it now because you want to play it.  It is not admissible unless it contradicts something that she has said.  You haven't heard it.  So we'll not just play a tape and run this thing sort of offbeat, off horse back without any sort of thought or notion as to what is there.  It is not going to be played. . . . |

After reporting the sexual assaults, L.S. began seeing Amy Holloman, a counselor. Ms. Holloman testified at trial, and was qualified as an expert on adolescent trauma.  She testified that it is uncommon for a child victim of this type of trauma to report the abuse right after it occurs.  She also opined that it was uncommon for children to be able to remember specific dates and instances because "[t]hey try to repress as much as possible."  However, she stated that it is very common in therapeutic situations for more information to come out once the child has established a trusting relationship with the counselor, which is what occurred with her and L.S.  Ms. Holloman then testified that she personally observed the following behavior in L.S.: "pacing in my office, avoiding eye contact, avoiding the subject matter, leaving my office."  According to Ms. Holloman, these specific behaviors coupled with the actual reporting of the incident are consistent with claims of sex abuse.

At the conclusion of the Commonwealth's case, Tuma's counsel moved to strike the evidence on the basis that the audio tape is the best evidence and that it is exculpatory.  The following exchange then took place:

| | |
|---|---|
| THE COURT: | Have you listened to the tape? |
| [COMMONWEALTH'S ATTORNEY]: | No, sir. |
| THE COURT: | So you don't know whether it is exculpatory or not? |
| [COMMONWEALTH'S ATTORNEY]: | No, sir. |
| THE COURT: | So therefore you didn't give it to him as being exculpatory because you never listened to it?  You don't think it is - - he is entitled to it because it is not exculpatory?  You just don't know? |
| [COMMONWEALTH'S ATTONEY]: | I relied on my investigator who had given me his notes and transformed that into a typewritten statement that codified what went on at that particular interview. |
| THE COURT: | So you are satisfied there is nothing significant or exculpatory?  Are you willing to stand on that?  If it is you will not have complied with Brady. |
| [COMMONWEALTH'S ATTORNEY]: | Yes, sir. |
| THE COURT: | You are willing to let that go? |
| [COMMONWEALTH'S ATTORNEY]: | Yes, sir. |
| THE COURT: | You don't know what is on there either? |
| [COMMONWEALTH'S ATTORNEY]: | Yes, sir. |
| THE COURT: | We have heard from two witnesses as to what was done, Mrs. Scheid and Mr. Gilliam both of them were cross examined.  This is just a tape of what they heard, correct? |

|                      | You are saying that you think it is exculpatory? |
|----------------------|--------------------------------------------------|
| [TUMA'S COUNSEL]:    | Yes, sir.                                         |
| THE COURT:           | In some way?                                      |
| [TUMA'S COUNSEL]:    | Yes, I mean I can't get the material. I have asked the representatives. |
| THE COURT:           | Well, I don't think you are entitled just to play something because you think it may be exculpatory or there may be something in there as slightly inconsistent three or four times they don't remember you had ham and eggs for breakfast one morning and another time you say sausage and eggs. I just don't think it is admissible, [Tuma's counsel]. The Court is not going to admit it. If at some point if your client is convicted that tape shows something that is significant, exculpatory, he gets a new trial. So that is the way we are going with it. We will just not play a tape I don't know if it is 15 minutes or two hours about a conversation we have heard two people testify to. |
| [TUMA'S COUNSEL]:    | Actually we have heard from three people about that conversation. We have heard from the victim herself, the conversation. We have heard from Mrs. Scheid, and we have heard from the investigator. |

On January 12, 2009, the jury returned a verdict of guilty on all three charges. On February 19, 2009, after the jury verdict but prior to entry of the conviction or sentencing orders, Tuma's counsel filed a subpoena *duces tecum* to obtain the audio tape from Dinwiddie DSS. On

February 27, 2009, Tuma's counsel filed a motion to compel the Commonwealth to deliver a copy of the audio tape to him. The Commonwealth's Attorney did not respond to Tuma's motion, but on or around March 7, 2009, Dinwiddie DSS filed a response to Tuma's motion to compel and subpoena *duces tecum* and stated that neither the Commonwealth's Attorney nor Tuma's counsel were entitled to the tape, because it was produced as a result of a social services investigation. On March 9, 2009, the trial court entered the conviction order confirming the jury's verdict. The proof of service for the subpoena *duces tecum* on Ms. Scheid of Dinwiddie DSS was returned on March 11, 2009, marked "too late for service." On April 17, 2009, Tuma's counsel filed a motion to preserve the tape recording with the trial court. The motion noted a hearing scheduled for April 30, 2009 on Tuma's motion to compel. At the hearing on April 30, 2009, the trial court ordered the attorney for Dinwiddie DSS to listen to the tape, remove any extraneous confidential information, and give the remainder to Tuma's counsel.

The transcript of the audio tape reflects that L.S. told Investigator Gilliam that the abuse occurred at the white house with the horses. L.S. initially did not remember how many times Tuma touched her, but Investigator Gilliam, upon more questioning, narrowed it down to "between five and ten times" while at the white house. Investigator Gilliam asked: "When he touched you um it would always be at the white house?" L.S. replied: "Yes." When asked if the abuse happened at any other house, L.S. replied that it did not. Ms. Scheid then asked more specifically if Tuma ever touched L.S. at Green Acres in the trailer or at Grandma's house. L.S. again replied "No" to both questions. When Ms. Scheid asked, "So everything you are telling me everything happened at the white house?" L.S. replied, "Yes." In fact, L.S. indicated five times throughout the interview that the touching occurred at the white house. When asked, "What part of the house would this happen in? Do you remember?" L.S. replied, "um yes in his room." L.S. never mentioned abuse occurring in her bedroom during the interview.

- 8 -

As part of his report, Investigator Gilliam summarized the interview of L.S. This summary was all that was provided to Tuma's counsel pursuant to his discovery requests, and Tuma's counsel used it to cross-examine Investigator Gilliam at trial. The summary stated, in part, "[L.S.] was asked when Billy touched her, she replied during visitation with her mother Debra." This question and answer is not found in the transcript of L.S.'s taped interview. The summary also reads: "[L.S.] was asked when was the last time Billy touched her, she replied at Nikki's house in December 07, Christmas holiday visitation." This statement also is not found in the interview transcript. The summary fails to convey L.S.'s difficulty remembering how many times Tuma touched her in the white house: in the interview transcript L.S. stated "I don't remember," before Investigator Gilliam, through questioning, helped her narrow it down to "between five and ten times." Most notably, the summary does not include L.S.'s three separate negative responses to the questions of (1) whether the touching occurred at any house other than the white house, (2) "[d]id anything ever happen at Grandma's house?", and (3) "has he ever touched you at Green Acres in the trailer?"

After listening to the tape, Tuma filed a motion to set aside the jury verdict based on exculpatory evidence discovered post-trial and a motion to strike the evidence as not sufficient to convict. On January 4, 2010, the trial court held a hearing on the motions, subsequently reviewed the trial transcripts, the audio tape of the interview, and the transcript of the audio taped interview. On January 29, 2010, the trial court entered an order denying the motions and entered the Commonwealth's drafted findings of fact and conclusions of law. On April 16, 2010, Tuma filed an objection to the trial court's finding of fact, conclusions of law, and January 29, 2010 order. On April 22, 2010, the trial court entered the sentencing order, which imposed the sentencing verdict of the jury, a sentence of thirty-five years. This appeal followed.

II.  Analysis

A.  The Failure to Disclose Exculpatory Evidence

1.  The Special Responsibilities of a Prosecutor

The role of public prosecutor, an attorney who represents the interests of the sovereign in criminal cases, has evolved in parallel with that of the Common Law of England and traces its pedigree back more than 750 years.  Lawrence del Brok in 1243 is considered the first professional attorney to prosecute pleas on behalf of the Crown.  J. Ll. J. Edwards, The Law Officers of the Crown 15 (Sweet & Maxwell) (1964).

In America, the earliest example of a public prosecutor is in the colony of Connecticut in 1704.

> [H]enceforth there shall be in every countie a sober, discreet and religious person appointed by the Countie Courts, to be Attorney for the Queen, to prosecute and implead in the lawe all criminall offenders, and to doe all other things necessary or convenient as an attorney to suppresse vice and imorallitie.

Charles J. Hoadly, The Public Records Of The Colony Of Connecticut: From August, 1689, To May, 1706 468 (Press of Case, Lockwood and Brainard) (1868); see also Jack M. Kress, Progress and Prosecution, in Annals of the American Academy of Political and Social Sciences 423 99, 103 (1976) ("In May of 1704, the Connecticut Assembly passed the law which is generally recognized as creating the first permanent office of public prosecutor on a colony-wide basis . . . .").

Early American case law also reflects the necessity that those who represent the government and its citizens be fair and honorable.

> He is to judge between the people and the government; he is to be the safeguard of the one and the advocate for the rights of the other; he ought not to suffer the innocent to be oppressed or vexatiously harassed, any more than those who deserve prosecution to escape; he is to pursue guilt; he is to protect innocence; he is to judge the circumstances, and according to their

true complexion, to combine the public welfare and the safety of the citizens, preserving both, and not impairing either. He is to decline the use of individual passions, and individual malevolence, when he cannot use them for the advantage of the public; he is to lay hold of them where public justice, in sound discretion, requires it.

Foute v. State, 4 Tenn. 98, 99 (1816).

The [prosecutor] is a quasi-judicial officer. He represents the commonwealth, and the commonwealth demands no victims. It seeks justice only, equal and impartial justice, and it is as much the duty of the [prosecutor] to see that no innocent man suffers, as it is to see that no guilty man escapes. Hence, he should act impartially. He should present the commonwealth's case fairly, and should not press upon the jury any deductions from the evidence that are not strictly legitimate.

Appeal of Nicely, 18 A. 737, 738 (Pa. 1889).

The higher standard of professionalism and duty applicable to those who represent the interests of the public and their government was succinctly restated in 1935 by Justice Sutherland, and his words are often quoted:

The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935).

Our Anglo-American system of justice presumes innocence in criminal cases and places a high burden on the attorney for the Commonwealth to overcome that presumption. However, other attorneys have no such obligation nor should they.

- 11 -

> Law enforcement officers have the obligation to convict the guilty and to make sure they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of the crime. To this extent, our so-called adversary system is not adversary at all; nor should it be. But defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must be and is interested in preventing the conviction of the innocent, but, absent a voluntary plea of guilty, we must also insist that he defend his client whether he is innocent or guilty. The State has the obligation to present the evidence. Defense counsel need present nothing, even if he knows what the truth is. He need not furnish any witnesses to the police, or reveal any confidences of his client, or furnish any other information to help the prosecutor's case. If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive, that will be his normal course. Our interest in not convicting the innocent permits counsel to put the State to its proof, to put the State's case in the worst possible light, regardless of what he thinks or knows to be the truth.

United States v. Wade, 388 U.S. 218, 256-58 (1967) (White, J., concurring and dissenting).

The asymmetry of the criminal justice system certainly places onerous demands on prosecutors. Defense attorneys may pursue acquittals notwithstanding all evidence to the contrary. While this provides fertile ground for many lawyer jokes, such zealous advocacy, despite any apparent hopelessness of the effort, is an essential ingredient to a fair trial and buttresses the foundation of our system of justice. Prosecutors may be understandably frustrated by the notion of unequal combat and with trials structured as zero-sum competitions featuring a clear winner and loser, they may be tempted to resist allowing their opponent any tactical advantage. However, the higher obligation to fairness and justice required of prosecutors is as integral to the effective operation of our system of justice as the duty of zealous representation of the defendant is for their courtroom opponents. Prosecutors must never forget that they are public servants whose oath requires them to serve their clients though a commitment to the fair, impartial, and objective administration of justice rather than the single-minded pursuit of victory, and they ignore that difference at their peril.

## 2. The Prosecutor's Duty with Respect to Exculpatory Evidence

Tuma argues that the audio tape made by Dinwiddie DSS of L.S.'s interview where she complained of sexual abuse "contained exculpatory evidence and should have been disclosed to defense counsel prior to trial." He contends that had the Commonwealth provided the tape to him, he could have used it to impeach the credibility of L.S., Ms. Scheid, Investigator Gilliam, and the counselor, Amy Holloman, and "the investigation against the defendant as a whole at trial."[2]

The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th century strictures against the use of perjured testimony and is most prominently associated with the decision by the Supreme Court of the United States in Brady v. Maryland, 373 U.S. 83 (1963). Brady held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; see also Moore v. Illinois, 408 U.S. 786, 794-95 (1972).

However, "[w]hen an exculpatory evidence claim is reviewed 'on appeal, the burden is on [the] appellant to show that the trial court erred.'" Gagelonia v. Commonwealth, 52 Va. App. 99, 112, 661 S.E.2d 502, 509 (2008) (quoting Galbraith v. Commonwealth, 18 Va. App. 734, 739, 446 S.E.2d 633, 637 (1994)). A "'constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence

---

[2] As discussed more fully below, we conclude that the evidence at issue is material and exculpatory because of its impeachment value with regard to L.S.'s testimony as well as with respect to the testimony of Investigator Gilliam and Ms. Scheid, whose testimony was based in part on L.S.'s interview statements. However, we find that the audio tape of L.S.'s interview with Investigator Gilliam and Ms. Scheid has no impeachment value with respect to Ms. Holloman's trial testimony, as her testimony only related to her opinion based on her expertise and L.S.'s statements made and behavior exhibited during counseling sessions. She did not testify to or comment on L.S.'s interview with Ms. Scheid and Investigator Gilliam.

in the outcome of the trial.'"  Teleguz v. Commonwealth, 273 Va. 458, 488, 643 S.E.2d 708, 727

(2007) (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)).  "In determining the

question of materiality, we consider the suppressed evidence as a whole, not item by item and if

a Brady violation is established, we do not engage in a harmless error review."  Id.[3]

The suppression by the prosecution of evidence favorable to the defendant "violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good

---

[3] Judge Beales' dissent ignores this approach as well as the definition of Brady
materiality as recited in Kyles v. Whitley, 514 U.S. 419, 434 (1995).  Instead, Judge Beales
parses L.S.'s testimony item by item, concludes that he would have found the discrepancies
regarding the quantum and location of her assaults insignificant and then performs exactly the
sort of harmless error analysis found inappropriate in Bagley.  His methodology fails to heed the
Supreme Court's admonition that

> Kyles instructed that the materiality standard for Brady claims is
> met when "the favorable evidence could reasonably be taken to put
> the whole case in such a different light as to undermine confidence
> in the verdict."  [Kyles,] 514 U.S. at 435; see also id. at 434-35 ("A
> defendant need not demonstrate that after discounting the
> inculpatory evidence in light of the undisclosed evidence, there
> would not have been enough left to convict.").

Banks v. Dretke, 540 U.S. 668, 698-99 (2004).
His dissent also displays a lack of appreciation for the basic concept that inconsistent
statements that conflict on the details of alleged criminal acts are by definition material, not
because they must affirmatively demonstrate innocence as suggested by Judge Beales, but rather
they are material because the inconsistencies with regard to the facts surrounding the offense
may be reasonably considered by the factfinder on the question of the witnesses' credibility and
the weight to be given their testimony.  Those tasked with assigning credibility to the witnesses
are not appellate judges reviewing a bare transcript; they are the citizens sitting on the jury.
Their credibility assessments take into account not only the words uttered by the witnesses, but
also the manner in which they spoke them along with any non-verbal mannerisms that were
observable but which no record can adequately document.  Thus, the jury should have been
permitted to include any inconsistencies from prior statements that related to any details of the
alleged offenses in their overall credibility analysis and weigh them accordingly.  In the context
presented by this record, the Brady issue is whether the inability to cross-examine the witnesses
in front of the factfinder with respect to inconsistencies between their trial testimony and an
earlier interview regarding details of the criminal acts undermines confidence that a fair trial was
had.  While a properly conducted new trial may well achieve the same result, the point we must
decide today is whether the totality of the record in this case supports a high degree of
confidence that the trial conducted in this case, was fair.  For the reasons discussed more fully
below, we reach the conclusion that it was not.

faith or bad faith of the prosecution." Brady, 373 U.S. at 87. "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). "[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

> While the definition of Bagley materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation, . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Kyles, 514 U.S at 437-38.

Indeed, as Justice Souter went on to observe in Kyles, "'The prudent prosecutor will resolve doubtful questions in favor of disclosure.'" Id. at 439 (quoting United States v. Agurs, 427 U.S. 97, 108 (1976)). "This is as it should be. Such disclosure will serve to justify trust in

the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" Id. (quoting Berger, 295 U.S. at 88).

Nevertheless, for evidence to be exculpatory, it must necessarily be material with respect to innocence or the degree of guilt with regard to lesser offenses, the degree of punishment that would be appropriate, or the impeachment of the credibility of a witness with regard to material facts. In Smith, the United States Supreme Court recently held that the undisclosed statements of an eyewitness were "plainly material" where the eyewitness' testimony was the *only* evidence linking the defendant to the crime. 132 S. Ct. at 630. At trial, the eyewitness identified Smith as the "first gunman to come through the door" and stated that he had been "face to face with Smith" during the robbery. Id. "No other witnesses and no physical evidence implicated Smith in the crime." Id. at 629. After his conviction, Smith found previously undisclosed notes of the lead investigator of the murder. Id. The investigator wrote on the night of the murder that the eyewitness could not supply a description of the perpetrators. Id. In notes taken five days after the crime, the investigator recorded that the eyewitness said he could not see faces and would not know the perpetrators if he saw them. Id. at 629-30. The investigator's typewritten report of his conversation with the eyewitness five days after the crime states that the eyewitness "'could not identify any of the perpetrators of the murder.'" Id. at 630. The Court observed that "evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." Id. However, such was not the case where the eyewitness' testimony was the only evidence linking the defendant to the crime, and his undisclosed statements directly contradicted his trial testimony. Id. While "the jury *could* have disbelieved [the eyewitness'] undisclosed statements," the Court had "no confidence that it *would* have done so." Id.

Smith controls our analysis here. Just as in Smith, L.S.'s testimony is the only evidence linking Tuma to the crimes in this case, and there is no physical evidence implicating Tuma. As the Commonwealth's entire case depended on L.S.'s account of Tuma's sexual abuse of her, L.S.'s undisclosed interview responses, where they materially varied from her trial testimony, constituted impeachment evidence material to Tuma's guilt or punishment.[4]

On cross-examination at trial, L.S. testified that Tuma touched her at her grandmother's house and about three times a week at the RV park. However, during the interview, L.S. replied that Tuma did not touch her at her grandmother's house and he did not touch her at the trailer park.[5] Investigator Gilliam asked during the interview, "When he touched you um [sic] it would always be at the white house?" L.S. replied, "Yes." Ms. Scheid asked, "So everything you are telling me everything happened at the white house?" L.S. replied, "Yes." L.S. affirmed five times during the interview that the touching occurred at the white house, which is the "house near the horses."

Further, at trial L.S. testified that the sexual assaults sometimes took place in her bedroom, but during the interview L.S. only stated that the assaults occurred in Tuma's room.

As for the number of times Tuma assaulted L.S., on direct examination at trial, L.S. could not recall how many times Tuma touched her when she lived in the house near the horses, but testified that it was "a lot." On cross-examination, L.S. stated that Tuma touched her more than ten times at the house next to the horses. During the interview, L.S. could not remember how

_____

[4] In Bagley, the United States Supreme Court "disavowed any difference between exculpatory and impeachment evidence for Brady purposes." Kyles, 514 U.S. at 434. See also Robinson v. Commonwealth, 231 Va. 142, 150, 341 S.E.2d 159, 164 (1986) (impeachment value alone makes information exculpatory).

[5] The exculpatory nature of this discrepancy in the locations where the alleged abuse occurred was compounded by the Commonwealth's response to Tuma's motion for a bill of particulars advising that L.S. had been sexually abused at both locations.

many times Tuma touched her at the house next to the horses; but after questioning, Investigator Gilliam narrowed her response to "between five and ten times."

The evidence contained in the undisclosed audio tape could have been used by Tuma for impeachment purposes to challenge the credibility of L.S., his accuser, and the only eyewitness against him. "When the 'reliability of a given witness may well be determinative of guilt or innocence,' evidence affecting the credibility of that witness should not be concealed by the prosecution." Burrows v. Commonwealth, 17 Va. App. 469, 472, 438 S.E.2d 300, 303 (1993) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)). In order to convict Tuma, the jury in this case had to believe L.S.'s testimony. Thus, Tuma's guilt or innocence depended entirely on L.S.'s reliability as a witness and any evidence affecting her credibility should have been revealed by the Commonwealth. However, it is important to note that the prosecutor's duty to disclose exculpatory evidence under Brady is not congruent with any obligation to disclose information under the rules and statutes regarding discovery, and the constitutional duty is triggered only when the information in the prosecutor's control becomes exculpatory. Thus, had L.S. testified consistently in the interview with Investigator Gilliam and Ms. Scheid, any pre-trial interviews with the prosecutor, and at trial, the audio tape would not have been exculpatory evidence, and there would have been no constitutional obligation on the part of the prosecutor to disclose it. See Taylor v. Commonwealth, 41 Va. App. 429, 436, 585 S.E.2d 839, 843 (2003) (the Commonwealth is not required to provide a defendant with investigative notes of witness statements unless the notes contain witness statements that are inconsistent or contradictory to that witness' or another witness' material testimony and could have been used to impeach the declarant or another witness). However, once L.S.'s interview statements proved inconsistent with her later account of the sexual assaults, whether when interviewed by the prosecutor before

trial[6] or, at the latest, at trial immediately following her inconsistent direct testimony, the audio tape of the interview became evidence material to Tuma's guilt and/or punishment and should have been immediately disclosed when the discrepancy became known or should have become known to the prosecutor.[7] For the same reason, the audio tape also became exculpatory when Investigator Gilliam and Ms. Scheid testified to statements made by L.S. to them that were materially different from those reflected in the audio tape of their interview.[8]

---

[6] Constitutional error may occur when the prosecution fails to assist the defense by disclosing information that might have been helpful in conducting the cross-examination. Bagley, 473 U.S. at 678. "[S]uch suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial." Id.

[7] That the prosecutor gave Tuma's counsel Investigator Gilliam's one-page written summary of L.S.'s "30 to 40 minute" interview prior to trial and relied upon it herself did not satisfy her responsibility under Brady. A single-page summary of such a lengthy interview, must necessarily have been incomplete and indeed, among other discrepancies with the transcript, the written summary does not include L.S.'s interview responses that nothing ever happened at Grandma's house, that Tuma never touched her at the Green Acres trailer, and that everything happened at the white house.

> While Brady does not embrace a "best evidence" rule prohibiting the use of summaries, such summaries of exculpatory evidence must be complete and accurate. . . . An incomplete or inaccurate summary could be constitutionally insufficient under Brady when the omissions or inaccuracies resulted in the prejudicial suppression of material evidence favorable to the defendant.

Garnett v. Commonwealth, 275 Va. 397, 409, 657 S.E.2d 100, 108 (2008). This case aptly illustrates the inherent risk, noted by our Supreme Court in Garnett, which a prosecutor takes on when only providing a "summary" of an interview in lieu of a verbatim recording or transcript. The written summary in this case does not include L.S.'s statements about where the abuse *did not* occur. The written summary also contained statements purportedly from L.S. that were not found in the transcript of the interview, without any explanation as to the discrepancy. Thus, the written summary was significantly incomplete.

[8] Ms. Scheid's trial testimony that L.S. reported abuse at Green Acres Trailer Park in the interview is not supported by the interview transcript. As previously noted, L.S. specifically stated in the interview, "it wasn't when we were living in the trailer . . . ," and further that the abuse did not occur at any other house than the white house. Thus, although Ms. Scheid testified at trial that the audio tape contained L.S. stating that the abuse occurred in the trailer, the record establishes that the tape did not contain such information. Therefore, Tuma's counsel could have

- 19 -

We note that the record in this case reflects that the Commonwealth's Attorney never listened to the audio tape of L.S.'s statements to Investigator Gilliam and Ms. Scheid to determine whether it conflicted in any material way with her pre-trial interviews with L.S., Ms. Scheid, or Investigator Gilliam, or their trial testimony. Moreover, when asked by the trial court, "Has this been denied to [Tuma's counsel], this tape?", the Commonwealth's Attorney responded, "No." In fact and despite this response and her later statement to the trial court that counsel for Tuma "could listen to it if he wants to," the prosecutor nevertheless failed to produce the tape or assist Tuma in obtaining it from Dinwiddie DSS when they refused to produce it upon Tuma's subsequent request. We also note that Dinwiddie DSS took the position that it would not disclose the contents of the audio tape to either the prosecutor or counsel for Tuma.

The law provides no support for the position taken by Dinwiddie DSS. To the contrary, the law is clear that the prosecutor is charged with the clear and affirmative duty of disclosing all exculpatory evidence in the possession, custody, or control of the Commonwealth and its agents. Any claim of Dinwiddie DSS that the audio tape was privileged information to DSS is easily dispensed with in light of this Court's well-settled precedent establishing otherwise. In Ramirez v. Commonwealth, 20 Va. App. 292, 296, 456 S.E.2d 531, 533 (1995), this Court held that employees of a local department of social services who were "involved in the investigation of the child abuse allegation were agents of the Commonwealth for purposes of Rule 3A:11(b)(2)." Specifically, this Court stated that, "where an agency is involved in the investigation or

---

used the audio tape to impeach Ms. Scheid's testimony stating that L.S.'s allegation regarding the Green Acres Trailer Park was on the audio tape.

Tuma also alleges that he could have used the audio tape to impeach Investigator Gilliam's testimony that L.S. mentioned the abuse at the Green Acres Trailer Park in the interview. As previously mentioned, L.S. specifically stated in the interview, "it wasn't when we were living in the trailer . . . ," and further that the abuse did not occur at any other house than the white house. Thus, although Investigator Gilliam testified at trial that L.S. had mentioned the trailer in the interview, the record establishes that the audio tape did not contain such information. Therefore, Tuma's counsel could have used the audio tape to impeach Investigator Gilliam's testimony that L.S. reported in the interview that Tuma abused her at the trailer.

- 20 -

prosecution of a particular criminal case, agency employees become agents of the Commonwealth for purposes of Rule 3A:11 and must be considered a party to the action for purposes of Rule 3A:12." Id. at 296-97, 456 S.E.2d at 533. "'The Commonwealth is charged with the responsibility to interview all government personnel involved in a case in order to comply with its discovery obligations.'" Knight v. Commonwealth, 18 Va. App. 207, 214, 443 S.E.2d 165, 169 (1994) (quoting Harrison v. Commonwealth, 12 Va. App. 581, 585, 405 S.E.2d 854, 857 (1991)). It is axiomatic that if personnel of a department of social services are agents of the Commonwealth for the purposes of discovery under Rule 3A:11, they are certainly such for the purpose of providing constitutional due process for a criminal defendant. By participating in a criminal investigation, Dinwiddie DSS was "acting on the government's behalf," Kyles, 514 U.S. at 437, and became an agent of the prosecutor for the purpose of Brady and its progeny, and it certainly had no authority to withhold evidence from either the prosecutor or Tuma that due process principles required be disclosed. Moreover, the Code of Virginia specifies that when a department of social services participates in a criminal investigation, it is the law enforcement agency and the prosecutor who determine what information to release to third parties and not the department.[9] The prosecutor in this case had a clear, unequivocal, and ongoing constitutional duty to learn of any favorable evidence known to Dinwiddie DSS, an agent acting on behalf of

---

[9] Code § 63.2-1516.1 provides that

> [i]n all cases in which an alleged act of child abuse or neglect is also being criminally investigated by a law-enforcement agency, and the local department is conducting a joint investigation with a law-enforcement officer in regard to such an alleged act, no information in the possession of the local department from such joint investigation shall be released by the local department except as authorized by the investigating law-enforcement officer or his supervisor or the local attorney for the Commonwealth.

See also Code § 63.2-105(A) ("Persons having a legitimate interest in child-protective services records of local departments include . . . attorneys for the Commonwealth.").

the Commonwealth, and to take active steps to disclose any that existed to Tuma. Therefore, beyond her initial duty to inquire about potentially exculpatory evidence in the possession of Dinwiddie DSS, once the prosecutor became aware of the existence of the tape, she had an affirmative responsibility to ensure that if its contents were or later became exculpatory, she disclose and produce it to the defense with sufficient timeliness that it could be used for possible impeachment.

The Commonwealth argues on brief that "even if" any of L.S.'s post-interview statements contradicted her interview responses, any impeachment value would be minimal considering Ms. Holloman's expert testimony that children attempt to repress events of abuse. However, the "jury determines the weight of the evidence and the credibility of the witnesses," Bloom v. Commonwealth, 262 Va. 814, 821, 554 S.E.2d 84, 87 (2001), and resolution of factual questions is "wholly within the province of the jury," Keener v. Commonwealth, 8 Va. App. 208, 214, 380 S.E.2d 21, 25 (1989). The jury is not required to accept the testimony of an expert witness; rather the "'jury has a right to weigh the testimony of all the witnesses, experts and otherwise.'" Walrod v. Matthews, 210 Va. 382, 390, 171 S.E.2d 180, 186 (1969) (quoting Pepsi-Cola Bottling Co. of Norfolk v. McCullers, 189 Va. 89, 99, 52 S.E.2d 257, 261 (1949)).

The Commonwealth asserts that in the context of the entire record, any impeachment value the audio tape would have provided does not undermine confidence in the jury's determination of Tuma's *guilt*. The Commonwealth's argument is essentially that, if the audio tape had been disclosed in a timely fashion, the jury *could* nevertheless have found L.S. credible and convicted Tuma, but given that the Commonwealth's case rested entirely on her testimony and applying the Supreme Court's holding in Smith, we have no confidence that it necessarily *would* have done so. Moreover, even if we agreed with the Commonwealth, our analysis regarding a Brady violation would not end there. A Brady violation occurs when the prosecution

suppresses evidence favorable to the defendant that is material *either* to guilt *or to punishment*. Brady, 373 U.S. at 87. In Cone, the United States Supreme Court found that the trial court should have considered the materiality of the evidence with respect to punishment in determining whether the suppressed evidence was material within the meaning of Brady. Cone, 556 U.S. at 472. The Court concluded that because "the evidence suppressed at Cone's trial may well have been material to the jury's assessment of the proper punishment in [the] case, . . . a full review of the suppressed evidence and its effect is warranted." Id. at 475.

In criminal cases in Virginia, "the power to determine punishment of one convicted of a criminal offense rests in the jury . . . . The jury's role has long been construed to be more than advisory, resulting in more than just a recommendation of punishment." Frye v. Commonwealth, 231 Va. 370, 397, 345 S.E.2d 267, 286 (1986). See Code § 19.2-295 (In a case tried by a jury, the jury shall ascertain the term of confinement and the amount of fine, if any, of a person convicted of a criminal offense).

That the impeachment evidence in the tape could have affected the credibility of L.S. in the eyes of the jury goes not only to the confidence in the outcome of the trial concerning Tuma's guilt or innocence, but also to the confidence in the sentence fixed by the jury. Had the jury known of L.S.'s recorded interview statements, that the abuse occurred only at the white house between five and ten times and not at the trailer or her grandmother's house, the jury very well could have doubted the number of times Tuma sexually abused L.S., considering that her interview statements contradicted her trial testimony. It is reasonable to conclude that the evidence of repeated occurrences of the sexual abuse at three separate locations impacted the jury's assessment of a proper punishment for Tuma. The evidence in the interview would have been favorable to Tuma as it could have been used to impeach the credibility of L.S.'s testimony on the number of times and different locations where Tuma sexually abused her. Therefore, the

evidence was also material to Tuma's degree of punishment, and suppression of the recorded interview constituted a separate Brady violation on that basis.

We now turn to the ongoing nature of the prosecutor's burden to comply with the requirements of Brady in the context of the record before us. "[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond [to a Brady request] might have had on the preparation or presentation of the defendant's case." Bagley, 473 U.S. at 683. The Supreme Court noted in Kyles that,

> While the definition of Bagley materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. *This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.* But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see Brady, 373 U.S. at 87), *the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.*

Kyles, 514 U.S. at 437-38 (emphasis added). We further note the United States Supreme Court's decision in Agurs, which made clear the prosecutor's duty to volunteer material exculpatory evidence to the defense even absent a specific request for such evidence by the defense. Agurs, 427 U.S. at 110.

While Tuma's counsel could have asked for a recess to listen to the audio tape of L.S.'s interview once he became aware of it during the trial, his failure to do so did not excuse or

dispense with the prosecutor's affirmative duty to discover any favorable evidence known to

others acting on the Commonwealth's behalf and to turn it over to Tuma.[10]  The

---

[10] Aside from the straw men not part of our analysis or ultimate holding in this case that Judge Kelsey raises and promptly strikes down with respect to any application of the Rules of Professional Conduct for attorneys and any foundational deficiencies regarding the admission of the audio tape, the thrust of Judge Kelsey's dissent flows from his initial flawed premise that the audio tape was "available during trial."  Judge Kelsey reasons that, since Tuma's counsel became aware of the audio tape's existence during the trial, any burden to learn the particulars of the exculpatory nature of the tape's contents fell upon Tuma, and he relies upon our Supreme Court's decision in Read v. Virginia State Bar, 233 Va. 560, 357 S.E.2d 544 (1987), to support his analysis.

Read, in turn, relied upon a decision of the United States Court of Appeals for the Tenth Circuit holding that "'Brady is not violated when Brady material is available to defendants during trial.'"  Id. at 565, 357 S.E.2d at 547 (quoting United States v. Behrens, 689 F.2d 154, 158 (10th Cir. 1982)).  In Read, the Court held that there was no Brady violation where the exculpatory information was already available for use by the defense.  Id. at 563-64, 357 S.E.2d at 546.  We fail to see how Read provides any support for the conclusion ultimately reached by Judge Kelsey.  In Read, unlike this case, the defense had possession of the exculpatory information from both the witnesses themselves and from the proffer made by the prosecutor on the record after it rested its case.

Judge Kelsey's dissent also quotes United States v. Elmore, 423 F.2d 775 (4th Cir. 1970), and observes that "no Brady violation occurs when the impeachment information was disclosed 'well before the end of the trial.'"  In Judge Kelsey's view, it is apparently enough to satisfy Brady by merely acknowledging the existence of the tape without the necessity for a prosecutor to do more to satisfy the rigors of due process.  However, the law is clear that a prosecutor's burden under Brady is not so amorphous and the approach taken by Judge Kelsey has been affirmatively rejected by the Supreme Court in Banks.  The notion that

> [a] rule thus declaring "prosecutor may hide, defendant must seek"
> is not tenable in a system constitutionally bound to accord
> defendants due process.  "Ordinarily, we presume that public
> officials have properly discharged their official duties.  We have
> several times underscored the special role played by the American
> prosecutor in the search for truth in criminal trials."  Courts,
> litigants, and juries properly anticipate that "obligations [to refrain
> from improper methods to secure a conviction] . . . plainly rest[ing]
> upon the prosecuting attorney, will be faithfully observed."

Banks, 540 U.S. at 696 (internal citations omitted).  It is the factual contents of the statements memorialized by the recording that the prosecutor was obligated to disclose, not the mere existence of their container.

Moreover, Judge Kelsey's dissent also contends that the judgment should be affirmed on what is essentially a "right result, wrong reason" basis since the prosecutor in this case never argued at trial the position Judge Kelsey's dissent adopts on appeal – that the strictures of Brady had been satisfied because Tuma "had access to the tape during trial."  To the contrary, such an

Commonwealth's Attorney should have reviewed the audio tape of L.S.'s interview in order to satisfy her duty to learn of any favorable evidence known to Dinwiddie DSS or the police investigating the case. The prosecutor's negligible efforts to comply with her responsibilities fell far short of what her oath of office and the law required of her. She did not listen to the tape yet represented to the trial court that it was not exculpatory, she relied on the investigator's inaccurate and incomplete notes of the interview without exercising any independent judgment in the matter, and she offered no assistance at any point in obtaining the tape for examination by Tuma's counsel. The record before us does not indicate when the prosecutor became aware of the existence of the audio tape, but it does reflect that after becoming aware of it, she simply turned a blind eye to an accessible audio recording of an investigatory interview of the only victim and eyewitness in the case on whose testimony the conviction rested. Never having listened to it, the prosecutor could not have known if the evidence in the audio tape was exculpatory, yet she nevertheless represented to the trial court that it was not.

Further, despite the prosecutor's representation to the trial court that counsel for Tuma "can listen to it if he wants to," with the benefit of the hindsight provided by the record in this case, the futility of any request Tuma might have made at trial for a recess to listen to the audio

analysis is inconsistent with the factual finding actually made. Relying on the representations of the prosecutor, the trial court concluded that the contents of the tape were not exculpatory and therefore the prosecutor had no duty to produce it. See Perry v. Commonwealth, 280 Va. 572, 579, 701 S.E.2d 431, 435 (2010) ("[C]ases are only proper for application of the right result for the wrong reason doctrine when the evidence in the record supports the new argument on appeal, and the development of additional facts is not necessary.").

Finally, despite Judge Kelsey's apparent conclusion that the prosecutor's statement that Tuma's counsel "can listen to it if he wants to" satisfied her affirmative duty under Brady, no timely disclosure ever actually occurred, because the prosecutor never produced the tape for the defense or disclosed the exculpatory nature of its contents at trial or at any other time. Furthermore, the prosecution's agent, Dinwiddie DSS, resisted every effort by the defense to obtain the tape and while it was ultimately produced after Dinwiddie DSS's efforts to resist doing so were exhausted, this was not done until well after trial and certainly not in a timely fashion such that it could be used to cross-examine L.S., Investigator Gilliam, or Ms. Scheid.

tape is obvious.  The prosecutor never produced the tape, either during the trial or during Tuma's

post-trial efforts to obtain access to the tape even as Dinwiddie DSS resisted Tuma's repeated

requests to turn the tape over.

We hold that on this record, the failure of the prosecution to turn over L.S.'s interview

statements to Tuma prior to cross-examination of L.S. at trial violated his due process right to a

fair trial and undermines confidence in the outcome of the trial, regarding both the jury's

determination of Tuma's guilt and their decision with respect to Tuma's sentence.  On this basis,

we find that the trial court erred in not granting Tuma's motion for a new trial based upon

after-discovered exculpatory evidence and we reverse Tuma's convictions and remand for a new

trial if the Commonwealth so elects.

### B.  Admissibility of the Audio Tape

In Tuma's remaining assignment of error, he argues that the trial court erred in refusing

to allow the jury to hear the audio tape and admit it into evidence, as it was clearly relevant to the

case.  Our resolution of the first assignment of error is dispositive of our ultimate holding

reversing Tuma's convictions, thus we need not address the admissibility of the audio tape.  See

Powell v. Commonwealth, 261 Va. 512, 531-32, 552 S.E.2d 344, 355 (2001) (the Court does not

need to address all assignments of error where the Court's opinion on other issues raised are

dispositive of the ultimate holding reversing the appellant's convictions).  Further, the issue

raised in Tuma's second assignment of error will not arise at a new trial.  See e.g. 1924 Leonard

Rd., L.L.C. v. Van Roekel, 272 Va. 543, 559, 636 S.E.2d 378, 388 (2006) (the Court declined to

address issues that would not affect its judgment and would not arise at a new trial); cf. Powell,

261 Va. at 535, 552 S.E.2d at 357 (where the Court reversed a capital murder conviction, it

found that it must consider other issues that may be relevant to a trial on remand for the murder

offense).  The trial court did not admit the audio tape into evidence because Tuma had not

listened to the tape and did not know what was on the tape at the time he asked the trial court to admit it into evidence and to play it for the jury. Should the Commonwealth elect to retry the case, the same issue regarding the admissibility of the audio tape would not arise because Tuma's counsel now has access to the tape. The question of admissibility of the tape into evidence would then be within the discretion of the trial court and governed by the applicable rules of evidence. Midkiff v. Commonwealth, 280 Va. 216, 219, 694 S.E.2d 576, 578 (2010). Therefore, we need not address this assignment of error.

## III. Conclusion

For these reasons, we reverse the judgment of conviction and remand this case to the trial court for a new trial consistent with this opinion if the Commonwealth is so advised.

Reversed and remanded.

Kelsey, J., dissenting.

On appeal, Tuma has the burden of making "*each* of *three* showings," <u>Skinner v. Switzer</u>, 131 S. Ct. 1289, 1300 (2011) (emphasis added), to undermine his criminal conviction under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

- First, Tuma must establish the undisclosed evidence was "favorable to the accused, either because it is exculpatory, or because it is impeaching." <u>Skinner</u>, 131 S. Ct. at 1300 (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999)).

- Second, he must prove "the State suppressed the evidence, 'either willfully or inadvertently.'" <u>Id.</u>

- Third, Tuma must show he suffered "prejudice," <u>id.</u>, by proving a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." <u>Smith v. Cain</u>, 132 S. Ct. 627, 630 (2012) (quoting <u>Cone v. Bell</u>, 556 U.S. 449, 469-70 (2009)).

These factors are not to be weighed in aggregate, with a strong showing on one compensating for a weak showing on another. Nor should they be blurred together into indistinct variables. Each of the "three components of a true <u>Brady</u> violation," <u>Strickler</u>, 527 U.S. at 281, must be independently proven on appeal by the defendant.

In this case, Tuma lays heavy emphasis on the first and third components of his claimed <u>Brady</u> violation. He addresses the second component — proof that the "State suppressed the evidence," <u>Skinner</u>, 131 S. Ct. at 1300 — almost as an afterthought. To be sure, he all but assumes it away in a highly emotive narrative claiming the trial judge joined in the suppression effort by denying Tuma access to the evidence at trial. Neither the law nor the record supports this assertion.

I.

BRADY & DSS VICTIM WITNESS STATEMENTS

With few exceptions, DSS interviews of sexual assault victims must be orally recorded. <u>See</u> <u>Jones v. West</u>, 46 Va. App. 309, 323, 616 S.E.2d 790, 798 (2005) (citing 22 Va. Admin.

- 29 -

Code § 40-705-80(B)(1)).  For <u>Brady</u> purposes, the audio recording is nothing more than a

statement by a victim witness.  If the statement claims the defendant committed the crime and

does not suggest otherwise, it is inculpatory — not exculpatory.  Neither the constitutional <u>Brady</u>

doctrine nor state law governing discovery in criminal cases[11] requires a prosecutor to provide

inculpatory witness statements to a defendant before, during, or after trial.  After all, "the

Constitution does not require the prosecutor to share all useful information with the defendant."

<u>United States v. Ruiz</u>, 536 U.S. 622, 629 (2002).  "There is no general constitutional right to

discovery in a criminal case, and <u>Brady</u> did not create one."  <u>Weatherford v. Bursey</u>, 429 U.S.

545, 559 (1977).

A witness statement, even if facially inculpatory before trial, can become exculpatory at

trial if the victim takes the stand and testifies in a manner inconsistent with the prior statement.

If this occurs, prosecutors then have an obligation to produce the inconsistent prior statement for

defense counsel to possibly use for impeachment purposes.  This disclosure obligation, however,

only arises at trial — not prior to trial — where, as here, the pretrial statement allegedly

contradicts the declarant's testimony at trial.  In this context, impeachment evidence does not

exist until a witness takes the stand and says something impeachable.

For this reason, Virginia follows the prevailing view that "<u>Brady</u> is *not* violated" when

impeachment material "is available to defendants *during trial*."  <u>Read v. Va. State Bar</u>, 233 Va.

560, 565, 357 S.E.2d 544, 547 (1987) (emphasis added) (quoting <u>United States v. Behrens</u>, 689

F.2d 154, 158 (10th Cir. 1982)).  As a matter of law, "no <u>Brady</u> violation" can occur when the

---

[11] Rule 3A:11 governs a defendant's discovery rights in a criminal proceeding.  "The Rule specifically does not authorize discovery of 'statements made by Commonwealth witnesses or prospective . . . witnesses to agents of the Commonwealth . . . in connection with the investigation or prosecution of the case.'"  <u>Juniper v. Commonwealth</u>, 271 Va. 362, 394, 626 S.E.2d 383, 404 (2006) (quoting Rule 3A:11(b)(2)).

defendant learns of the potential impeachment evidence "in sufficient time to make use of [it] at trial." Read, 233 Va. at 564, 357 S.E.2d at 546. As Judge Easterbrook has explained: "A prosecutor must disclose information favorable to the defense, but disclosure need not precede trial. Brady thus is a disclosure rule, not a discovery rule. Disclosure even in mid-trial suffices if time remains for the defendant to make effective use of the exculpatory material." United States v. Higgins, 75 F.3d 332, 335 (7th Cir. 1996) (citation omitted); see generally 6 Wayne R. LaFave, Criminal Procedure § 24.3(b), at 365 (3d ed. 2007) (observing that "the prosecution should be able to satisfy its constitutional obligation by disclosure at trial").

It does not matter that the prosecutor was or should have been "aware of the information" prior to trial. Read, 233 Va. at 564, 357 S.E.2d at 546 (citing United States v. Darwin, 757 F.2d 1193 (11th Cir. 1985)). Nor does it matter if the defendant must recall a witness for the purpose of impeachment:

> The point in the trial when a disclosure is made, however, is not in itself determinative of timeliness. We agree with those circuits holding that a defendant must show that the failure to earlier disclose prejudiced him because it came so late that the information disclosed could not be effectively used at trial. Appellant here made no such showing. In fact, *although Dunn had completed his testimony, the trial itself was far from over. Appellant could have recalled Dunn for further questioning but chose not to.*

Darwin, 757 F.2d at 1201 (emphasis added and citations omitted), quoted in part by Read, 233 Va. at 564-65, 357 S.E.2d at 546-47; see also United States v. Davis, 306 F.3d 398, 421 (6th Cir. 2002) (holding disclosure of impeachment material during trial, when witnesses were subject to recall, satisfied Brady).[12]

---

[12] See also United States v. Mangual-Garcia, 505 F.3d 1, 5-6 (1st Cir. 2007); United States v. Delgado, 350 F.3d 520, 527 (6th Cir. 2003); United States v. Kime, 99 F.3d 870, 882 (8th Cir. 1996); United States v. Catano, 65 F.3d 219, 227 (1st Cir. 1995); United States v. Gordon, 844

In Read, the Virginia Supreme Court relied on United States v. Elmore, 423 F.2d 775 (4th Cir. 1970), which held no Brady violation occurs when the impeachment information was disclosed "well before the end of the trial," particularly given that defense counsel could have requested "a continuance for whatever further time might have been necessary." Id. at 780. This common-sense principle parallels the disclosure requirements of Rule 3A:11. A defendant who "failed to move for a continuance or even for a recess in order to consider the material" cannot "be heard to complain that he had insufficient time to prepare for trial." Frye v. Commonwealth, 231 Va. 370, 384, 345 S.E.2d 267, 277 (1986); see Madsen v. Dormire, 137 F.3d 602, 605 (8th Cir. 1998) (finding no Brady violation because defendant "did not request a continuance" to examine the evidence disclosed for the first time at trial); Higgins, 75 F.3d at 335 ("If counsel needed more time, she had only to ask; yet she did not seek a continuance. Nothing more need be said.").[13]

Brady is not a canon of prosecutorial ethics, as the majority mistakenly assumes. *Ante*, at 10-12. Brady enforces the threshold requirements of the Due Process Clause, not a state's code of ethics. See Cone, 556 U.S. at 470 n.15 ("Although the Due Process Clause of the Fourteenth

---

F.2d 1397, 1403 (9th Cir. 1988); United States v. Adams, 834 F.2d 632, 634-35 (7th Cir. 1987); United States v. Kopituk, 690 F.2d 1289, 1340 (11th Cir. 1982); State v. Aikins, 932 P.2d 408, 437 (Kan. 1997); People v. Monroe, 17 A.D. 3d 863, 864 (N.Y. App. Div. 2005).

[13] This point has been made in many different disclosure contexts. See, e.g., Davis v. Commonwealth, 230 Va. 201, 204, 335 S.E.2d 375, 377 (1985) (finding no prejudice under Rule 3A:11 where defendant "did not request either a postponement or a continuance"); Knight v. Commonwealth, 18 Va. App. 207, 215, 443 S.E.2d 165, 170 (1994) (taking into account that the defendant "did not request a continuance in light of the late disclosure"). Accord United States v. Collins, 415 F.3d 304, 310-11 (4th Cir. 2005); United States v. Gamez-Orduno, 235 F.3d 453, 461-62 (9th Cir. 2000); United States v. Sepulveda, 15 F.3d 1161, 1178 (1st Cir. 1993); United States v. Diaz-Villafane, 874 F.2d 43, 47 (1st Cir. 1989); United States v. Holloway, 740 F.2d 1373, 1381 (6th Cir. 1984); Apolinar v. State, 106 S.W.3d 407, 421 (Tex. Crim. App. 2003), aff'd on other grounds, 155 S.W.3d 184 (Tex. Crim. App. 2005); Gutierrez v. State, 85 S.W.3d 446, 452 (Tex. Crim. App. 2002); Rodriguez v. State, 962 P.2d 141, 145-46 (Wyo. 1998); LaFave, *supra*, at 365.

Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations." (citing *inter alia* ABA Model Rule of Prof'l Conduct 3.8(d), which Virginia adopted in 2000 as Va. Rule of Prof'l Conduct 3.8(d))); see also Kyles v. Whitley, 514 U.S. 419, 437 (1995) (noting that Brady "requires less of the prosecution than" ABA Model Rule 3.8(d)); see also VSB Legal Ethics Op. 1862 (draft published Mar. 15, 2012).[14] In Brady cases, therefore, an appellate court sits not as a disciplinary committee of the state bar — but rather as a court of review, ensuring only that the criminal conviction satisfies the threshold requirements of due process.

## II.
### DISCLOSURE OF THE TAPE AT TRIAL

In this case, a recorded pretrial interview of the victim witness alleged Tuma's guilt in considerable detail. The recorded statement was internally consistent and, thus, inculpatory on its face. The Commonwealth had no duty to provide Tuma with the recorded interview unless and until the victim took the stand and testified inconsistently with it. Several statements from the recorded interview, Tuma claims, could have been used to impeach the victim's testimony at trial. Perhaps so — but that only meant the recording had to be made "available" to Tuma's counsel "during trial," Read, 233 Va. at 565, 357 S.E.2d at 547, so counsel could decide whether, and if so, how, to use the recorded statement.

---

[14] Accord Brooks v. Tennessee, 626 F.3d 878, 892-93 (6th Cir. 2010) (noting "the Brady standard for materiality is less demanding than the ethical obligations imposed on a prosecutor"). See also ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 09-454 (2009) (rejecting the "incorrect assumption" that Rule 3.8(d) merely "codif[ied] the Supreme Court's landmark decision in Brady v. Maryland" and acknowledging that the "ethical duty" of the rule is "separate from disclosure obligations imposed under the Constitution, statutes, procedural rules, court rules, or court orders").

It was certainly no secret that the recording existed. Prior to trial, Tuma's counsel met with the investigating officer and directly "asked him whether or not there was a tape" of the victim's interview. App. at 516. The investigator said he believed so, but was not sure. Id. On appeal, Tuma's counsel admits he had an "indication" and a "feeling" prior to trial that a tape existed. See Oral Argument Audio at 6:45 to 6:55.

The existence of the tape was confirmed early in the trial. The investigating officer, the second of the Commonwealth's six witnesses, testified he believed the interview was recorded. The DSS investigator, the third witness, testified the interview was recorded and she had the tape with her in the courtroom. The entire interview, she added, lasted only thirty to forty minutes.

When Tuma's counsel learned of the tape's presence in the courtroom, he did not ask for permission to listen to it. Instead, he inexplicably moved to admit the recorded interview, in its entirety, *into evidence* — even though neither he, the prosecutor, nor the trial judge had listened to it. The trial judge correctly refused to admit the tape into evidence under such circumstances. Even if portions of the audiotape had qualified for impeachment, only those specific portions could have been presented to the jury, and only after Tuma's counsel had laid the proper foundation necessary for impeachment.[15] He could not do that without first listening to the recorded statement.

---

[15] Tuma's counsel apparently thought it appropriate to put the tape in the player, press the play button, and admit into evidence every word, from start to finish. Suffice it to say, the trial judge correctly understood impeachment simply does not work that way. "Extrinsic evidence of a prior inconsistent oral statement by a witness is not admissible unless the witness is first afforded an opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. . . . Extrinsic evidence of a witness's prior inconsistent statement is not admissible unless the witness denies or does not remember the prior inconsistent statement. Extrinsic evidence of collateral statements is not admissible." Boyd-Graves Conference, A Guide to Evidence in Virginia § 613(a)(ii), at 75 (2012), soon to be Va. Rule of Evid. 2:613(a)(ii) (effective July 1, 2012); see also Charles E. Friend, The Law of Evidence in Virginia § 4-5(c)(1), at 147 (6th ed. 2003).

The trial judge's evidentiary ruling, however, was not a <u>Brady</u> ruling precluding Tuma's counsel from listening to the tape. Indeed, the record shows the judge twice made clear to Tuma's counsel that he could listen to the tape: "You can go listen to it if you want to on your own time," the judge explained. App. at 318. "You can take it off and listen to it," the judge clarified. <u>Id.</u> "He can listen to it if he wants to," the prosecutor concurred. <u>Id.</u> at 319. Yet, as Tuma's counsel concedes, he *never once asked* for the opportunity to listen to the tape outside the jury's presence. <u>See</u> Oral Argument Audio at 32:30 to 32:40.[16]

In his post-trial hearing on the <u>Brady</u> issue, Tuma's counsel argued he was denied access to the tape before and after trial but *conceded* he had access to the tape *during* trial. App. at 523-24. Tuma's counsel admitted the prosecutor "*at the trial* said *I could have access to it* and things of that nature." <u>Id.</u> at 523 (emphasis added). Counsel similarly acknowledged the trial court "was clear *at the trial* that I would be able to get it and listen to it." <u>Id.</u> at 537 (emphasis added). These concessions refute any suggestion that the trial court precluded Tuma's counsel from listening to the tape at trial.[17]

These facts also belie the inapt characterization of this case as one which, if affirmed, would suggest the "prosecutor may hide" but the "defendant must seek." *Ante*, at 25 n.10. The

---

[16] The majority's criticism of DSS's reluctance to release the tape *after* trial contributes nothing to the analysis. The <u>Brady</u> violation either occurred or did not occur *at* trial. Just as a disclosure after trial cannot remedy a <u>Brady</u> violation at trial, a nondisclosure after trial cannot violate <u>Brady</u> if a proper disclosure was made at trial.

[17] These undisputed facts, coupled with Tuma's concessions, undermine the majority's effort to mischaracterize my dissent as a right-result-wrong-reason scenario requiring additional factfinding. <u>See</u> *ante*, at 25 n.10. I also find no merit in the assertion that my reasoning is "inconsistent" with the trial court's factual findings. <u>Id.</u> The trial court concluded no <u>Brady</u> violation occurred because the tape was not exculpatory or prejudicial. I conclude no <u>Brady</u> violation occurred *even if* the tape were exculpatory and prejudicial because Tuma's counsel had access to it during trial. The two views are entirely consistent — both conclude no <u>Brady</u> violation occurred (relying on different prongs of the <u>Brady</u> test) and neither logically nor legally negates the other.

majority lifts this language from <u>Banks v. Dretke</u>, 540 U.S. 668 (2004), which involved a prosecutor *successfully* hiding information from a defendant at trial. Here, unlike <u>Banks</u>, the prosecutor did not hide anything: Two of her witnesses openly *disclosed* the existence of the tape, and the prosecutor (as well as the trial judge) *suggested* Tuma's counsel "listen to it if he wants to." App. at 319. This was not a game of "hide" and "seek." *Ante*, at 25 n.10. The tape was *found* — in the courtroom, early in the trial, with plenty of time to put it to whatever use Tuma's counsel may have desired.

In short, Tuma's argument on appeal — that the "denial of the information contained on the tape amounted to a prejudice against the defendant," Appellant's Br. at 32 — rests on one of two false assumptions. If Tuma means he was denied the tape before trial, he mistakenly assumes <u>Brady</u> required pretrial disclosure. It did not. The tape did not become exculpatory until the victim testified in a manner inconsistent with it. "<u>Brady</u> is *not* violated" when impeachment material "is available to defendants *during trial*." <u>Read</u>, 233 Va. at 565, 357 S.E.2d at 547 (emphasis added and citation omitted).

If Tuma means he was denied the tape at trial, he mistakenly assumes the court's refusal to "play the tape" in the presence of the jury meant that he could not play it for himself. The trial judge could not have been clearer: Tuma's counsel could listen to it, but the tape would not be admitted into evidence without the proper foundation — necessarily requiring that someone in the courtroom (usually the proponent of the evidence) listen to it first.

The majority excuses counsel's failure to listen to the tape on the paradoxical ground that it will not excuse the prosecutor for her failure to do the same. "While Tuma's counsel *could have* asked for a recess to listen to the audio tape of L.S.'s interview once he became aware of it during the trial," the majority reasons, "his failure to do so did not excuse or dispense with the prosecutor's affirmative duty to discover any favorable evidence known to others acting on the

Commonwealth's behalf and to turn it over to Tuma." *Ante*, at 24-25 (emphasis added). The majority cites no authority in support of this reasoning, because none exists.

Under settled principles, if Tuma's counsel truly had access to the tape during trial for the purpose of impeachment, there was no Brady violation as a matter of law — no matter what the prosecutor did or did not do. See United States v. Smith Grading & Paving, Inc., 760 F.2d 527, 532 n.6 (4th Cir. 1985) (explaining that "the fact that disclosure came from a source other than the prosecutor is of no consequence"); see also *supra*, at 31 n.12, 32 n.13 (citing Brady cases not excusing a defendant's failure to ask for a recess, continuance, or an opportunity to recall a witness).[18]

In the end, the majority sidelines this debate as unimportant because "the futility of any request Tuma might have made at trial for a recess to listen to the audio tape is obvious." Id. at 26-27. This *ipse dixit* implies a bold accusation.[19] The majority apparently believes it "obvious" the trial judge would have arbitrarily denied a brief recess (if one had been requested) for Tuma's counsel to listen to the tape — after twice suggesting that he do so. Nothing in the record suggests this censorious supposition is true, much less obvious. We will never truly know, of

_____

[18] It is for this reason we can say "no Brady violation occurs 'if the evidence in question is available to the defendant from . . . sources [other than the Commonwealth].'" Gagelonia v. Commonwealth, 52 Va. App. 99, 113, 661 S.E.2d 502, 509-10 (2008) (alteration in original) (quoting United States v. Wilson, 901 F.2d 378, 380 (4th Cir. 1990)).

[19] I also question other rhetorical excesses in the majority opinion, such as the description of the "asymmetry" of the criminal justice system, the "fertile ground for many lawyer jokes," the "apparent hopelessness" of advocacy of defense counsel, and prosecutors' alleged frustration with the "unequal combat" required by due process. *Ante*, at 12. I similarly wince at the declaration that criminal defense counsel have no "obligation to ascertain or present the truth," but, rather, may use whatever stratagem available to "confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure or indecisive" in pursuit of an acquittal. Id. (citation omitted). If the majority means only to say Brady requires prosecutors to divulge exculpatory evidence but does not similarly require defense counsel to divulge inculpatory evidence, simply saying so should suffice to make the point.

course, because Tuma's counsel never asked for a brief recess to listen to the tape. I do not see how the trial judge can be blamed for that.

I respectfully dissent.

Beales, J., dissenting.

Today I fear the Court effectively creates a broader rule under Brady v. Maryland, 373 U.S. 83 (1963), than the United States Supreme Court and Virginia's appellate courts have ever before established under Brady. The majority opinion effectively holds in this case that the failure to disclose *any* prior inconsistencies by a complaining witness in a child sexual abuse case *per se* renders that evidence "material" under Brady and its progeny, and, therefore, will require reversal of the conviction.[20] Today's holding, I fear, waters down the clear and settled requirement for a defendant to establish that he has actually been *prejudiced* by the failure to disclose impeachment evidence in order to prevail in a Brady claim and get his conviction overturned.

I find no basis in the case law for applying the materiality requirement of a Brady claim as loosely as the majority does here – particularly in a case, such as this one, where the new impeachment evidence does not call into question whether the witness misidentified the defendant, does not call into question whether the witness had a motive to fabricate the allegation of sexual abuse, and does not call into question whether the witness revealed something during her interview with the authorities that otherwise would significantly damage the credibility of her core accusation of sexual abuse at trial. To the extent L.S.'s statements before trial and at trial were inconsistent (and were not already known from the pre-trial disclosure of the written

---

[20] Specifically, the majority opinion in this case holds,

> [O]nce L.S.'s interview statements *proved inconsistent* with her later account of the sexual assaults, whether when interviewed by the prosecutor before trial, or, at the latest, at trial immediately following her direct testimony, *the audio tape of the interview became evidence material* to Tuma's guilt and/or punishment and should have been immediately disclosed when the discrepancy became known or should have become known to the prosecutor.

(Emphasis added).

summary of the interview), several such inconsistencies were presented to the jury by defense counsel and others could have been presented by defense counsel based on what was learned during the trial. Moreover, as I discuss more at length below, the only actual type of inconsistency here from L.S. that would even be the proper subject of a <u>Brady</u> analysis in this case concerned the same type of inconsistency that was already presented to – and considered by – the jury.

For these reasons – and for the reasons that follow – I respectfully dissent from the majority's opinion that reverses appellant's convictions for taking indecent liberties with a child, for aggravated sexual battery of a child, and for animate object sexual penetration of a child. I would affirm each of those convictions.[21]

## I. THE <u>BRADY</u> RULE

In <u>Brady</u>, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Brady</u>, 373 U.S. at 87. "'If the defendant does not receive such evidence, or if the defendant learns of the evidence at a point in the proceedings when he cannot effectively use it, his due process rights as enunciated in <u>Brady</u> are violated.'" <u>Muhammad v. Warden of Sussex I</u>

---

[21] I would remand the matter to the trial court for the very limited purpose of correcting a clerical error in the final sentencing order. The sentencing order states that appellant's sentence for aggravated sexual battery was 25 years – which is greater than the statutory maximum of 20 years of imprisonment for an aggravated sexual battery conviction. However, it is clear from the trial transcript that the jury recommended a 25-year sentence for animate object sexual penetration (which is within the statutory maximum of life in prison) – not for aggravated sexual battery (for which the jury recommended a 5-year sentence). It is also clear from the trial transcript that the trial judge sentenced appellant in accordance with the jury's recommendations. Thus, the trial court's final order simply reverses appellant's sentences for aggravated sexual battery and for animate object sexual penetration, and I would remand the matter to the trial court for the specific purpose of correcting this clerical error.

State Prison, 274 Va. 3, 4, 646 S.E.2d 182, 186 (2007) (quoting Muhammad v. Commonwealth, 269 Va. 451, 510, 619 S.E.2d 16, 49-50 (2005)).

However, case law makes very clear that "constitutional error occurs, and the conviction must be reversed, only if the evidence is material" in the Brady sense. Teleguz v. Commonwealth, 273 Va. 458, 488, 643 S.E.2d 708, 727 (2007); see United States v. Bagley, 473 U.S. 667, 678 (1985). According to the United States Supreme Court's decision in Bagley, evidence is material under Brady "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

The "reasonable probability" discussed in Bagley is defined as "a probability sufficient to *undermine confidence in the outcome*." Id. (emphasis added). Thus, what the Brady rule really tests is whether the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). If the verdict is no longer worthy of confidence, then the defendant has been prejudiced under Brady and is entitled to a new trial. Conversely, if the verdict remains worthy of confidence, then the defendant has not been prejudiced under Brady and a new trial is not required. Thus, materiality under Brady is dependent on prejudice to the defendant, as the Supreme Court of Virginia has explained:

> "There are three components of a violation of the rule of disclosure
> first enunciated in Brady: a) The evidence not disclosed to the
> accused must be favorable to the accused, either because it is
> exculpatory, or because it may be used for impeachment; b) the
> evidence not disclosed must have been withheld by the
> Commonwealth either willfully or inadvertently; and c) *the
> accused must have been prejudiced*."

Garnett v. Commonwealth, 275 Va. 397, 406, 657 S.E.2d 100, 106 (2008) (emphasis added) (quoting Workman v. Commonwealth, 272 Va. 633, 644-45, 636 S.E.2d 368, 374 (2006)).

Viewed in this light, the withholding of impeachment evidence is not enough to constitute a Brady violation – rather, the withheld impeachment evidence must be "material" in the Brady sense, thereby causing prejudice to the defendant sufficient to undermine confidence in the outcome.  See Lovitt v. Warden of Sussex I State Prison, 266 Va. 216, 245, 585 S.E.2d 801, 818 (2003) ("A prosecutor's suppression of impeachment evidence creates a due process violation *only if* the suppression deprives the defendant of a fair trial under the Brady standard of materiality." (emphasis added) (citing Bagley, 473 U.S. at 678; McDowell v. Dixon, 858 F.2d 945, 949 (4th Cir. 1988))).

I largely agree with the majority opinion's very thorough description of a prosecutor's responsibilities and duties to uphold the principles of justice.  Furthermore, I would assume without deciding for the purposes of this case that the prosecutor here *should* have listened to the audiotape of L.S.'s interview by Ms. Jon Webster Scheid of Dinwiddie County's Department of Social Services and Investigator Dwayne Gilliam of the Dinwiddie County Sheriff's Office prior to trial – or, at least, once the issue of the audiotape was raised during the trial.  As the majority correctly notes, the prosecutor in this case made certain representations to the trial court concerning the contents of the audiotape without first having actually listened to the audiotape.

However, the ultimate focus of the Brady test is *not* and never has been to determine what steps the prosecutor should or should not have taken in a given case.  Moreover, the purpose of the Brady test is not to catalog the areas where a witness' testimony differs from her prior statements.  Both of these inquiries certainly can be relevant considerations *within* a Brady analysis, but the ultimate issue under Brady is whether the defendant has or has not been prejudiced to a constitutionally significant degree.  In the words of the United States Supreme Court, "prejudice must have ensued."  Strickler v. Greene, 527 U.S. 263, 282 (1999).

"The absence of prejudice, by itself, defeats [a] <u>Brady</u> claim and renders all other issues analytically superfluous." <u>Deville v. Commonwealth</u>, 47 Va. App. 754, 758, 627 S.E.2d 530, 532 (2006). In the final analysis, therefore, the rule in <u>Brady</u> tests whether the defendant has been prejudiced to the extent that confidence in the outcome of the trial has, to "a reasonable probability," been *undermined*. <u>See</u> <u>Bagley</u>, 473 U.S. at 682. Simply put, confidence in the outcome of the trial has *not* been undermined here.

## II. ANALYSIS OF APPELLANT'S <u>BRADY</u> CLAIM

Here, we have a seven-year-old witness, L.S., who, despite her young age, has consistently asserted that she was sexually abused and has consistently asserted that appellant William Tuma was the perpetrator of the sexual abuse. Nothing that L.S. said that was recorded on the audiotape of the interview with Ms. Scheid and Investigator Gilliam in any way contradicts the allegation that she was sexually abused and that appellant sexually abused her. For example, appellant cites no statements from L.S. during the audiotaped interview calling into question whether L.S. misidentified the perpetrator of the sexual abuse, or raising the possibility that someone else (and not appellant) sexually abused her, or revealing even the slightest hint of a motive to fabricate the sexual abuse allegation on her part.

L.S. also has consistently asserted that appellant sexually abused her at the white house next to the horses on Boydton Plank Road in Dinwiddie County,[22] and absolutely no statements that were recorded during the interview contradict that assertion either. L.S. testified at trial, of course, that the sexual abuse occurred at other locations *in addition* to the white house – even though the audiotape of the interview reflects that she told Ms. Scheid and Investigator Gilliam that the sexual abuse occurred only at the white house and stated that the sexual abuse did not

---

[22] At trial, this residence was referred to as both the "white house" and the house "next to the horses." For purposes of this dissent, this residence simply will be referred to as the "white house."

occur at two of these other locations she mentioned at trial (i.e., the Green Acres Trailer Park and her grandmother's house). This inconsistency is the essence of appellant's <u>Brady</u> claim – the only real inconsistency in L.S.'s account that could not have been discovered based on Investigator Gilliam's written summary of the interview with L.S.

However, any conceivable impact arising from this inconsistency must be considered minimal when appellant's <u>Brady</u> claim is "'evaluated in the context of the entire record'" – in the manner that binding authority instructs this Court to review any claim under <u>Brady</u>. <u>Robinson v. Commonwealth</u>, 220 Va. 673, 676, 261 S.E.2d 318, 320 (1980) (quoting <u>United States v. Agurs</u>, 427 U.S. 97, 104, 112 (1976)).

A. <u>The Jury Was Aware that L.S. Made Prior Inconsistent Statements</u>

Appellant was charged with one count of taking indecent liberties with a child, one count of aggravated sexual battery, and one count of animate object sexual penetration. At a minimum, L.S., despite her young age, has consistently asserted that appellant sexually abused her five to ten times at the white house – an assertion that was reflected both on the audiotape of the interview with Ms. Scheid and Investigator Gilliam and in the investigator's written summary of the interview, which was provided to the defense before trial. Appellant could have been convicted of all three charged offenses if the jury believed that *even one episode* of sexual abuse occurred at the white house, as asserted by L.S. during the interview and then at trial.[23]

---

[23] This statement does not end the analysis – on appeal in this case, we are not, of course, reviewing the sufficiency of the evidence supporting appellant's convictions (which would be overwhelming) or reviewing for harmless error. <u>Kyles</u>, 514 U.S. at 434-36. However, it is certainly significant to consider that the jury was not asked to determine if one and only one *specific* allegation of abuse was credible and true. From the five to ten times – or, based on her trial testimony, more than ten times – that L.S. alleged that the sexual abuse occurred, the jury in this case was entitled to convict appellant of the charged offenses even if it believed that the charged sexual abuse occurred only once and rejected *all* of L.S.'s *other* assertions of sexual abuse on other occasions. And the same principle holds true with a new jury, of course, now that the matter has been remanded for a new trial.

- 44 -

The trial transcript establishes that L.S.'s credibility was challenged by the defense at trial. The jury could readily compare statements L.S. made to Ms. Scheid and Investigator Gilliam during her pre-trial interview with the statements L.S. made during her testimony at trial. Inconsistencies were pointed out during cross-examination of the Commonwealth's witnesses and by appellant's trial attorney during closing argument.

Based on the defense's cross-examination of Investigator Gilliam and Ms. Scheid, the jury was aware that L.S. asserted *for the first time at trial* that appellant sexually abused her three times per week while they were staying at an RV park in Prince George County. This assertion was never made during the audiotaped interview. In fact, the Prince George RV park was *never even mentioned* during this interview.

To be sure, this prior inconsistency was underscored during Ms. Scheid's cross-examination, during which the following exchange with appellant's trial attorney occurred:

> Q: Nothing happened in a RV park in Prince George?
>
> A: I know nothing.
>
> Q: That never came [up]?
>
> A: I know nothing.

Moreover, appellant's trial attorney alluded to L.S.'s testimony about the Prince George RV park during closing argument, when counsel reminded the jury that L.S. at one point testified "that it happened three times a week" – a clear reference to L.S.'s testimony about the sexual abuse at the Prince George RV park.

In addition, while L.S. testified at trial that appellant sexually abused her at her grandmother's house, the jury became aware *during the trial* that L.S. had informed Ms. Scheid and Investigator Gilliam at the time of the interview that she was never sexually abused at her grandmother's house. On cross-examination at trial, L.S. testified that appellant sexually abused

- 45 -

her at her grandmother's house – which is not located in Dinwiddie County, as was clearly established during L.S.'s cross-examination.  During Ms. Scheid's cross-examination, however, Ms. Scheid testified:

> Q:  Did you ask her if this man here touched her *anywhere other than Dinwiddie*?
>
> A:  Yes.
>
> Q:  You did?
>
> A:  Yes.
>
> Q:  Her answer was?
>
> A:  *Only in Dinwiddie*.

(Emphasis added).  Although Ms. Scheid's recollection of this portion of the interview with L.S. was not fully accurate at the time of trial,[24] this testimony conveyed the essentials of what L.S. indicated during the audiotaped interview – that appellant *did not* sexually abuse her at L.S.'s grandmother's home, which is located outside of Dinwiddie County.

Therefore, Ms. Scheid's testimony that is excerpted above:  (a) categorically *excluded* L.S.'s grandmother's home from being a place where L.S. asserted during the interview that appellant sexually abused her; and (b) categorically *included* L.S.'s grandmother's home as a place where L.S. indicated during the interview that appellant *did not* sexually abuse her.  The defense learned of this information in time to call into question the credibility of L.S.'s trial testimony that appellant sexually abused her at her grandmother's house.  Appellant cannot now establish the required prejudice under Brady simply because his defense counsel did not use this known inconsistency for impeachment purposes during the trial, even though, as just noted, his defense counsel knew about it.

---

[24] The audiotape of the interview reflects that L.S. said that appellant did not sexually abuse her at her grandmother's house, not that appellant did not sexually abuse her outside of Dinwiddie County.

The jury was also aware that L.S. testified at trial that the sexual abuse occurred *more* than ten times – based on a fair reading of the trial transcript, perhaps a lot more than ten times – and that L.S.'s testimony, therefore, contradicted her earlier statement during the interview with Ms. Scheid and Investigator Gilliam that appellant sexually abused her between five and ten times. Appellant's trial attorney actually highlighted this discrepancy for the jury during his closing argument, asserting that "we have had answers all over the map as to how many times it happened." Thus, the jury heard substantial impeachment evidence and argument concerning the consistency of the details of L.S.'s assertions of sexual abuse.

### B. Appellant Presents the Same *Type* of Impeachment Evidence that Was Already Presented at Trial

On appeal, the impeachment evidence that appellant presents in his Brady claim is really just the same type of impeachment evidence that the jury already considered at trial, when the jury could compare L.S.'s statements reflected in Investigator Gilliam's summary of the interview with L.S.'s testimony at trial. See Lockhart v. Commonwealth, 34 Va. App. 329, 346, 542 S.E.2d 1, 9 (2001) (noting that Lockhart's Brady evidence "was simply more of the same type of evidence and would not, we conclude, have put the whole case in such a different light as to undermine confidence in the verdict"); see also Byrd v. Collins, 209 F.3d 486, 518 (6th Cir. 2000) ("'[W]here the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.'" (quoting United States v. Avellino, 136 F.3d 249, 257 (2d Cir. 1998))); United States v. Cuffie, 80 F.3d 514, 518 (D.C. Cir. 1996) (explaining that "undisclosed impeachment evidence can be immaterial because of its cumulative nature only if the witness was already impeached at trial by the same kind of evidence").

In this case, some of the *details* of L.S.'s inconsistencies cited by the majority opinion are now different, in light of the specific statements from L.S. that are reflected on the audiotape, but they concern the *same types of inconsistencies* from L.S. that the jury already considered – i.e., where the sexual abuse occurred and how many times the sexual abuse occurred. However, even this assessment of appellant's <u>Brady</u> claim overstates the strength of his argument on appeal. This is because the audiotape and the investigator's summary reflect *no* differences in the number of times that L.S. asserted she had been sexually abused during the interview.[25] Appellant's trial attorney actually used the information in the investigator's summary to impeach L.S. on this subject just as effectively as he could have used the audiotape. Consequently, what appellant's <u>Brady</u> claim *actually* boils down to is L.S.'s inconsistency concerning where, *in addition* to the white house, the sexual abuse occurred. However, as noted above, the jury was already aware that L.S. had been inconsistent on this very same subject of where the sexual abuse occurred.

_____

[25] On brief, appellant refers to other "areas of interest" of L.S.'s trial testimony that, he claims, could have been the subject of impeachment if the audiotape had been disclosed by the time of trial. While the analysis of a <u>Brady</u> claim must reflect "the cumulative effect" of all asserted <u>Brady</u> evidence, <u>Kyles</u>, 514 U.S. at 459, these additional subjects presented in appellant's brief present essentially no new impeachment value. As to whether the alleged sexual abuse of L.S. occurred only in appellant's bedroom or in his bedroom and also in L.S.'s bedroom, the audiotape of L.S.'s interview and Investigator Gilliam's written summary of the interview both contain the same information. As to whether L.S.'s mother was present in the bedroom when the alleged sexual abuse occurred, nothing that L.S. stated during the audiotaped interview was in tension with her trial testimony that her mother was not present during the sexual abuse. As to L.S.'s testimony at trial that appellant told L.S. to fondle her younger brother (on her mother's side of the family) in the bathtub, neither the audiotape of the interview nor the investigator's written summary of the interview contains this assertion. Thus, the defense could have impeached L.S.'s testimony on that subject just as effectively using the written summary of the interview as it could have using the audiotape of the interview. Furthermore, it should be noted that L.S. actually referred to this specific incident well before trial – indeed, before her interview with Ms. Scheid and Investigator Gilliam – when L.S. told her father about this incident after she fondled her younger nephew (on her father's side of the family). Therefore, the jury was certainly aware that L.S.'s assertion that appellant directed her to fondle her younger brother in the bathtub was not an assertion made for the first time at trial.

## C. The Decision in *Smith v. Cain* is Distinguishable

According to the majority opinion in this case, the United States Supreme Court's recent decision in <u>Smith v. Cain</u>, 132 S. Ct. 627 (2012), is controlling on the facts of this case. I respectfully disagree. In my view, the circumstances in <u>Smith</u> were very different than the circumstances are here. See <u>Lockhart</u>, 34 Va. App. at 346, 542 S.E.2d at 9 ("The materiality inquiry is a context-specific determination; evidence that is material in one setting could be immaterial in another."). The circumstances that rendered the undisclosed impeachment evidence material in <u>Smith</u> do not somehow make appellant's asserted <u>Brady</u> evidence material in this case.

In <u>Smith</u>, the issue was the eyewitness' identification of Smith as one of three gunmen who committed murder during a home invasion and armed robbery. At trial, the prosecution's star eyewitness (Boatner) testified that Smith was the first gunman to come through the door and that he had been face-to-face with Smith during the robbery. Boatner testified that he had "[n]o doubt" that Smith was the gunman with whom he had stood face-to-face on the night of the crime. However, the prosecution had failed to disclose to the defense statements that Boatner made on the night of the crime and five days after the crime indicating that Boatner could not identify any of the gunmen. <u>Smith</u>, 132 S. Ct. at 629-30.

On appeal from the lower courts' refusal to grant Smith post-conviction relief under <u>Brady</u>, the United States Supreme Court held that "Boatner's undisclosed statements were plainly material," explaining:

> We have observed that evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. See <u>United States v. Agurs</u>, 427 U. S. 97, 112-113, 96 S. Ct. 2392, 49 L. Ed. 2d 342, and n. 21 (1976). That is not the case here. Boatner's testimony was the *only* evidence linking Smith to the crime. And Boatner's undisclosed statements directly contradict his testimony: Boatner told the jury that he had "[n]o doubt" that Smith was the gunman

- 49 -

he stood "face to face" with on the night of the crime, but Ronquillo's notes show Boatner saying that he "could not ID anyone because [he] couldn't see faces" and "would not know them if [he] saw them." App. 196, 200, 308. Boatner's undisclosed statements were plainly material.

Smith, 132 S. Ct. at 630 (emphasis in original).

In context, the Supreme Court's statement that "Boatner's testimony was the *only* evidence linking Smith to the crime" means that Boatner was the only witness at Smith's trial who could *identify* Smith as one of the gunmen present on the night of the crime.[26] The jury believed Boatner's testimony that Smith was one of the gunmen and convicted him. However, if the jury had been presented evidence that Boatner was unable to identify any of the gunmen, including Smith, at the time of the crime, then the jury could well have disbelieved Boatner's testimony that Smith was one of the gunmen. The inconsistencies between Boatner's trial testimony and his earlier statements implicated the very basic, highly material question of whether Smith *was even there* when the crimes were committed. Because the question of Smith's presence at the crime scene suddenly appeared in a new and different light, Smith's

_____

[26] I disagree with the majority's assertion that L.S.'s testimony is "the only evidence linking" appellant to the crimes here. L.S.'s father testified at trial that L.S. told him that appellant "had abused her" by "sticking his fingers inside of her." Moreover, L.S.'s stepmother testified that L.S. told her that she "had been sexually abused" and that "[appellant] had been placing his fingers on her private parts and that had been going on for some time." These statements from L.S. were not made during the recorded interview – and, in fact, predated that interview. Furthermore, Ms. Amy Holloman, L.S.'s counselor who spent many hours with L.S., has concluded that L.S. was sexually abused, given the symptoms and behavior manifested by this child and Ms. Holloman's extensive experience in evaluating such children. No objection was made against any of this testimony, and there is no indication from the record that this testimony was admitted for any purpose other than the truth of the matter asserted. While all of this evidence, of course, originated from L.S.'s own statements and behavior, the very nature of sexual assault and sexual abuse cases is that there are no eyewitnesses to the sexual abuse other than the perpetrator and the victim. That is why the testimony of the victim in such cases is enough to obtain a conviction. See, e.g., Fisher v. Commonwealth, 228 Va. 296, 299, 321 S.E.2d 202, 204 (1984) (noting that "the victim's testimony, if credible and accepted by the finder of fact, is sufficient evidence, standing alone, to support the conviction" in a rape or sexual abuse case).

- 50 -

asserted <u>Brady</u> evidence "'undermine[d] confidence in the outcome of the trial.'" <u>Id.</u> (quoting <u>Kyles</u>, 514 U. S. at 434).

Aside from its recitation of general <u>Brady</u> principles, the decision in <u>Smith</u> has essentially no application to the context of the record of this particular case. There was no question at appellant's trial that L.S. could accurately identify appellant – and the audiotape of L.S.'s interview certainly contains nothing new on this subject.

The Supreme Court of Virginia's opinion in <u>Bly v. Commonwealth</u>, 280 Va. 656, 702 S.E.2d 120 (2010), also provides a useful contrast with the facts of this case. To prove Bly's guilt, the Commonwealth relied on a confidential informant's testimony attesting that he had participated in two alleged controlled drug transactions with Bly – but the Commonwealth did not disclose to the defense that the police were aware that the confidential informant had been providing false accounts of controlled transactions, was *only* paid by the authorities if he reported a drug transaction, and had reported a total of eighty-three controlled buys during a seven-month period. <u>Id.</u> at 658-60, 702 S.E.2d at 121-22. The Supreme Court granted Bly a new trial under <u>Brady</u>, explaining:

> In the present case, in view of (1) the Commonwealth's failure to introduce the audio recordings Hoyle was equipped to make of his dealings with Bly, (2) the lack of any other evidence to corroborate Hoyle's testimony as to those transactions, and (3) Hoyle's obvious pecuniary incentive to fabricate drug "buys," the suppression of evidence that *could have led to a devastating impeachment* of Hoyle's credibility undermines confidence in the outcome of the trial.

<u>Id.</u> at 663, 702 S.E.2d at 124 (emphasis added). In <u>Bly</u>, therefore, the suppression of evidence that the confidential informant had a substantial motive to fabricate drug buys was material under <u>Brady</u> because the confidential informant's credibility could have been devastated if the jury had known this information.

What Smith and Bly (and other Brady decisions[27]) have in common is the suppression of *significant* evidence that affects the credibility of a prosecution witness to the degree that it truly impacts and undermines confidence in the verdict. In such cases, "the omitted evidence creates a reasonable doubt that did not otherwise exist" based on solely the evidence that was presented at trial. Agurs, 427 U.S. at 112. This case is very different than those cases. The audiotape of L.S.'s interview did not contain any new information that would suggest that L.S. misidentified appellant, that someone other than appellant had sexually abused L.S., or that L.S. had not been sexually abused at all and had simply fabricated the allegation that she had been sexually abused. Instead, appellant's asserted Brady evidence only concerns certain inconsistencies in comparatively minor *details* associated with her allegation that appellant sexually abused her – i.e., where, *in addition to* the white house, the sexual abuse occurred. And the jury was already aware from the evidence and argument at trial that L.S. had been inconsistent in this regard.

Unlike in Smith, appellant's asserted Brady evidence "was of a no more significant nature than the impeachment evidence already presented at trial," Lockhart, 34 Va. App. at 346, 542 S.E.2d at 9 – or that defense counsel could have *exploited* at trial, based on the evidence as it developed during the trial. Appellant's asserted Brady evidence is "simply more of the same type of evidence and would not . . . have put the whole case in such a different light as to undermine confidence in the verdict." Id.

---

[27] For example, in Kyles, the United States Supreme Court held that the suppressed Brady evidence significantly eroded the reliability of identifications of Kyles made by two key prosecution witnesses – and also called into question whether the informant in that case should have been considered a suspect. Kyles, 514 U.S. at 441-43, 445-47. Moreover, in Workman, the Supreme Court of Virginia held that, as to Workman's claim of self-defense, "Workman was deprived of introducing evidence of three recent incidents involving Bumbry firing weapons at others." Workman, 272 Va. at 650, 636 S.E.2d at 377. "Most certainly, such evidence has the potential to be *powerful impeachment* of Bumbry's statement at trial that he did not have a gun at the scene and his denial" that he carried firearms." Id. at 650, 636 S.E.2d at 377-78 (emphasis added). Therefore, Workman's Brady claim implicated "evidence of Workman's reasonable apprehension for his safety and evidence of who was the aggressor in this altercation." Id. at 650, 636 S.E.2d at 378.

D.  Applying Appellant's *Brady* Claim to the Context of the Record Here

Appellant's Brady claim essentially concerns the precise location or locations where L.S. asserted that appellant sexually abused her – not any misidentification of appellant on L.S.'s part, and not anything relating to a motive to fabricate the allegation on L.S.'s part, but simply the location or locations where appellant committed the sexual abuse against L.S.

Appellant's Brady claim does not detract in any way from L.S.'s consistent assertion that appellant sexually abused her at the white house in Dinwiddie County.  Furthermore, L.S.'s inconsistency on the question of whether appellant sexually abused her at her grandmother's house outside of Dinwiddie County was learned by the defense at trial and could have been exploited by the defense at trial.  Moreover, L.S.'s inconsistency concerning her accusation that appellant sexually abused her at the Prince George RV park was known by the defense at trial, based on both Investigator Gilliam's written summary of the prior interview with L.S. and Ms. Scheid's testimony at trial –  and was exploited by the defense at trial.

Thus, distilled to its essence, what appellant's Brady claim really boils down to is an unresolved factual question of whether L.S. asserted that appellant sexually abused her one time at the Green Acres Trailer Park – stated apparently after the tape recorder stopped recording L.S.'s statement to Ms. Scheid and Investigator Gilliam.[28]  In my view, this one question does

---

[28] In response to Investigator Gilliam's final question asking where the last incident of sexual abuse occurred, L.S. stated, "um the last time was last year after I saw last year um when I was seeing him um it wasn't when we were living in the trailer it was when I was like living with" – and then the tape recorder stopped recording the rest of her answer.  According to Investigator Gilliam's summary of the interview, L.S. subsequently indicated that the last incident of sexual abuse occurred at the family friend's trailer home, which the investigator determined was in the Green Acres Trailer Park in Dinwiddie County.  The audiotape reflects that L.S. stated earlier in the interview that appellant did not sexually abuse her at that trailer home.  While it is true that L.S. is never actually heard saying at the conclusion of the interview that the last incident of sexual abuse occurred there, it should be noted that the Commonwealth's response to appellant's pre-trial motion for a bill of particulars indicated that appellant was alleged to have committed criminal acts at the Green Acres Trailer Park – in addition to the white house.  Thus, the Commonwealth's bill of particulars response could be used to

not come close to undermining confidence in the outcome of appellant's trial, especially when the entire record is considered, as case law demands that we do.

I certainly disagree with the majority's broad assertion that my analysis in this dissenting opinion simply ignores the Brady materiality standard that the United States Supreme Court stated in Kyles. On the contrary, my analysis is actually grounded in the Kyles standard – i.e., that evidence becomes material under Brady only when it could "reasonably be taken to put *the whole case* in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435 (emphasis added). I emphasize the United States Supreme Court's use of the words "the whole case" because those words reflect the longstanding principle that a Brady claim must be "evaluated in the context of the entire record" of the case. Agurs, 427 U.S. at 112. The majority opinion would appear to find any undisclosed statements that a seven-year-old witness makes in a child sexual abuse case that are even slightly inconsistent on the details of the alleged offense are enough to trigger the Brady materiality rule – and thus, require the reversal of the convictions. However, Brady and its progeny do not establish a *per se* rule that inconsistent statements concerning the details of alleged child sexual abuse "are by definition material" in such a situation under Brady, as the majority contends. As an appellate court, we are required to evaluate the inconsistent statements – at first individually,[29] and then consider them collectively

corroborate Ms. Scheid's and Investigator Gilliam's testimony that L.S. stated that she was sexually abused at the trailer park, as reflected by the investigator's written summary of the interview.

[29] While the majority opinion vaguely criticizes this dissenting opinion for "pars[ing] L.S.'s testimony item by item," I am simply following the United States Supreme Court's instructions for reviewing a Brady claim. As the Supreme Court explained in Kyles, an appellate court reviewing a Brady claim must "evaluate the tendency and force of the undisclosed evidence item by item; there is no other way." Kyles, 514 U.S. at 437 n.10. The appellate court should then determine the "cumulative effect [of this evidence] for purposes of materiality separately" at the conclusion of the Brady analysis. Id. I have, therefore, evaluated each of appellant's contentions regarding L.S.'s pre-trial interview and trial testimony item by item (and have noted that several of appellant's contentions simply lack force for the purpose of a Brady

- 54 -

– and determine whether the asserted Brady evidence could "reasonably be taken to put *the whole case* in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435 (emphasis added). Accordingly, we must consider not *just* the inconsistent statements – but *also* the broader context of the record in this case.

Here, the Commonwealth also presented expert testimony from L.S.'s child therapist, who explained that it is uncommon for children who have been sexually abused "to remember specific dates and instances of sexual abuse" because "they try to repress that as much as possible" and that it is common "for more information to come out" after a young victim of sexual abuse begins therapy. L.S.'s therapist testified, in her expert opinion, that the behavior L.S. exhibited in front of her was consistent with the behavior of a child who had been sexually abused and that she did not believe that L.S. was lying to her. The majority notes that a jury need not accept an expert's opinion – which is, of course, true. However, viewing "the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party" in the trial court, Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004), *this Court* must accept as a historical fact that L.S. fondled her younger nephew during a Super Bowl party in early 2008. Both L.S. and her nephew were naked from the waist down at the time. L.S. explained after the incident that she touched her nephew inappropriately because appellant had touched her in a similar manner.

The incident between the young L.S. and her nephew during the Super Bowl party provides an important layer of context to the analysis here. Evidence that L.S. acted out sexually

---

analysis). Based on United States Supreme Court precedent, there is no other way of conducting a Brady materiality analysis to determine, in the end by considering the whole case, whether confidence in the verdict has been undermined.

in this way is evidence corroborating her contention that she had been sexually abused[30] – and the issue of whether she had been sexually abused *at all* was the issue of contention at appellant's trial. (Neither the evidence at trial *nor* the audiotape of the interview provides even the slightest suggestion that *someone else* had sexually abused L.S.) No new ground could have been developed on the issue of whether L.S. had actually been sexually abused – even if the defense had been given the audiotape of L.S.'s interview with Ms. Scheid and Investigator Gilliam before or during the trial.

Appellant simply was not prejudiced by the Commonwealth's earlier failure to disclose the audiotape to the defense. As the majority notes, it is appellant's burden to establish a reasonable probability that, if his claimed Brady evidence had been disclosed to the defense, the result of the proceeding would have been different. See, e.g., Gagelonia v. Commonwealth, 52 Va. App. 99, 112, 661 S.E.2d 502, 509 (2008). In short, appellant simply has not shown that confidence in the outcome of his trial has been undermined to a reasonable probability – as required by the Brady rule.

### E. Materiality as to Punishment

The majority also provides an alternative basis for reversal under Brady here. Even if appellant's asserted Brady evidence is not material as to guilt, the majority states that it is still material as to punishment. Certainly, as a general matter, reversal is required under Brady where the suppressed "evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87; see Cone v. Bell, 556 U.S. 449, 451 (2009).

---

[30] Significantly, this incident with L.S.'s nephew was entirely consistent with Ms. Holloman's expert testimony reflecting her very common sense observation that, as she indicated, young children who have been the victims of sexual abuse will then tend to "act[] out sexually" towards others.

Here, however, I see no indication in the record that appellant ever raised in the trial court a Brady claim *as to punishment*. Instead, appellant's arguments in the trial court centered solely on materiality *as to guilt* under Brady. On this basis, I would hold that any argument raised on appeal that there was suppression of evidence that is material *as to punishment* is barred under Rule 5A:18. Furthermore, appellant has not requested that this Court apply an exception to Rule 5A:18, and this Court does not apply such an exception *sua sponte*.

In addition, having reviewed the record in this case, I do not believe that appellant has satisfied Brady's materiality standard even as to punishment. The only real basis in the record that I can detect for even arguing that appellant here was prejudiced as to punishment is to note that he was sentenced above the statutory minimum for his offenses. Certainly, however, the fact that an inconsistency by a witness was not disclosed to the defense in time to be used at trial cannot be considered material simply because the defendant did not receive the minimum possible punishment. Otherwise, any time there is a lack of disclosure and the minimum sentence is not given for each conviction, this would be a *per se* violation of Brady.

In my view, appellant has failed to establish a reasonable probability that his punishment would have been different if the audiotape of L.S.'s interview had been disclosed to the defense.

### III. CONCLUSION

Assuming without deciding that the Commonwealth should have listened to the tape recording of L.S.'s interview to determine if it had exculpatory material, the failure to do so, under these particular circumstances, does not establish the required materiality in the constitutional sense under Brady. There was not much more or truly different impeachment evidence that could be brought forward to impeach this seven-year-old child that was not already available to the defense to provide to the factfinder, and the victim here was always consistent that appellant sexually abused her at the "white house." Appellant was not prejudiced in any

material way under the standard set forth by the United States Supreme Court in <u>Brady</u> and by the opinions of the United States Supreme Court and the Supreme Court of Virginia interpreting and applying <u>Brady</u>.  Accordingly, since I believe appellant's "trial result[ed] in a verdict worthy of confidence," <u>Kyles</u>, 514 U.S. at 434, I would affirm the convictions in this case.

# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **13th** *day of* **December, 2011**.

William Edward Tuma,                                                                                    Appellant,

 against            Record No. 0919-10-2
                    Circuit Court Nos. CR08-145 through CR08-147

Commonwealth of Virginia,                                                                          Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Felton, Judges Elder, Frank, Humphreys, Kelsey, Haley, Petty, Beales, Alston and Huff

On November 22, 2011 came the appellee, by the Attorney General of Virginia, and filed a petition requesting that the Court set aside the judgment rendered herein on November 8, 2011, and grant a rehearing *en banc* on the issue(s) raised in the petition.

On consideration whereof, the petition for rehearing *en banc* is granted with regard to the issue(s) raised therein, the mandate entered herein on November 8, 2011 is stayed pending the decision of the Court *en banc*, and the appeal is reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35(b).  The appellant shall attach as an addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the Court in this matter.  It is further ordered that the appellee shall file twelve additional copies of the appendix previously filed in this case.  In addition, any party represented by counsel shall file twelve electronic copies of their brief with the clerk of this Court.  The electronic copies must be filed on

twelve separate CDs or DVDs and must be filed in Adobe Acrobat Portable Document Format (PDF).[1]

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By: *original order signed by a deputy clerk of the Court of Appeals of Virginia at the direction of the Court*

Deputy Clerk

---

[1] The guidelines for the creation and submission of a digital brief package can be found at www.courts.state.va.us, in the Court of Appeals section under "Resources and Reference Materials."

COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Beales and Senior Judge Clements
Argued at Richmond, Virginia


WILLIAM EDWARD TUMA

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 0919-10-2            JUDGE JEAN HARRISON CLEMENTS
                                                        NOVEMBER 8, 2011
COMMONWEALTH OF VIRGINIA


              FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
                        Thomas V. Warren, Judge Designate

              Linwood T. Wells, III, for appellant.

              Craig W. Stallard, Assistant Attorney General (Kenneth T.
              Cuccinelli, II, Attorney General, on brief), for appellee.


        William Edward Tuma was convicted following a jury trial of taking indecent liberties with

a child, aggravated sexual battery, and animate object penetration.  On appeal, Tuma contends the

trial court erred by 1) ruling "that the evidence discovered by the defense during the jury trial, an

audiotape, was not exculpatory in nature and therefore need not have been disclosed by the

Commonwealth prior to trial pursuant to Brady v. Maryland," 373 U.S. 83 (1963), and 2) "refusing

to allow the jury to hear the tape and admit it into evidence."  We agree the trial court erroneously

denied his motion for a new trial based on the Commonwealth's failure to disclose the statement.

Therefore, we reverse the convictions and remand for a new trial.

        As the parties are fully conversant with the record in this case, and because this

memorandum opinion carries no precedential value, this opinion recites only those facts and

_____

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

BACKGROUND

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'" Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)).

Tuma was accused of sexually molesting his stepdaughter, L.S., beginning in January 2006 when the child was five years old. She eventually reported the incidents, and on February 6, 2008, Jon Webster Scheid, a Department of Social Services supervisor, and Investigator Dwayne Gilliam interviewed the victim. During the trial, Tuma's counsel learned that Scheid and Gilliam had recorded the interview with the child.

Although the Commonwealth provided defense counsel with a written summary of the initial interview, prior to trial, the Commonwealth did not provide counsel with the actual recording. In fact, Tuma's counsel was unable to acquire the tape until after trial, at which time he moved for a new trial based on the alleged Brady violation.

Both Scheid and Gilliam testified at trial and, after having reviewed their notes, indicated that the contents of the recording comported with the summary provided to the defense. They also testified about their interview with the victim and were subject to cross-examination by defense counsel. The victim, as well, testified at trial and recounted the interview.

The Commonwealth also introduced the testimony of the victim's counselor, Amy Holloman. She explained that children often do not recall specific dates or instances of abuse because they attempt to repress such events. She indicated it was typical for a child victim to

recall more details about sexual abuse over time as the victim establishes a "trusting relationship."

Tuma sought to have the tape played at trial, but the trial court overruled the motion. Tuma also asserted the Commonwealth failed to properly disclose the existence of the tape prior to trial pursuant to Brady.

ANAYLSIS

I.

Tuma contends that had the tape been provided to him pre-trial, "he could have used it to impeach the credibility of four witnesses, [the victim], Jon Webster Scheid, Investigator Gilliam and the counselor, Amy Hollman, and the investigation against the defendant as a whole at trial."[1] He maintains that the evidence "was exculpatory in nature and should have been disclosed by the Commonwealth prior to trial."

When we review an exculpatory evidence claim, "'[o]n appeal, the burden is on appellant to show that the trial court erred.'" Gagelonia v. Commonwealth, 52 Va. App. 99, 112, 661 S.E.2d 502, 509 (2008) (quoting Galbraith v. Commonwealth, 18 Va. App. 734, 739, 446 S.E.2d 633, 637 (1994)).

Due process requires the Commonwealth to disclose to the defendant all favorable evidence material to his guilt or punishment. Brady, 373 U.S. at 86-87; see also Youngblood v. West Virginia, 547 U.S. 867, 869 (2006); Garnett v. Commonwealth, 275 Va. 397, 406, 657 S.E.2d 100, 106 (2008). "'There are three components of a true Brady violation: The evidence at

---

[1] Because we conclude the contested evidence was exculpatory and material as to the complaining witness, we need not decide whether the evidence was also exculpatory and material as to the other witnesses. "An appellate court decides cases 'on the best and narrowest ground available.'" Luginbyhl v. Commonwealth, 48 Va. App. 58, 64, 628 S.E.2d 74, 77 (2006) (en banc) (quoting Air Courier Conf. v. Am. Postal Workers Union, 498 U.S. 517, 531 (1991) (Stevens, J., concurring)).

issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" Coley v. Commonwealth, 55 Va. App. 624, 631, 688 S.E.2d 288, 292 (2010) (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)). "Stated differently, 'the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" Workman v. Commonwealth, 272 Va. 633, 645, 636 S.E.2d 368, 374 (2006) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

Exculpatory evidence is evidence that is favorable to the accused and includes impeachment evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). Exculpatory "information known to the police is information within the Commonwealth's knowledge and the prosecutor is obliged to disclose [it] regardless of the state of his actual knowledge." Moreno v. Commonwealth, 10 Va. App. 408, 418, 392 S.E.2d 836, 842-43 (1990).

In its ruling, the trial court concluded "the tape . . . is material but inadequate that it should produce opposite results on the merits at another trial. It is not exculpatory." However, the statements on the recording contradict to varying degrees the child's trial testimony, and, thus, had impeachment value. Accordingly, the trial court erred by holding the statements were not exculpatory.

Even though the statements were exculpatory, Tuma is not entitled to a new trial unless the statements were also material. See Lockhart v. Commonwealth, 34 Va. App. 329, 345, 542 S.E.2d 1, 8 (2001). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682.

Because the victim's testimony was the only evidence supporting the charges, L.S.'s credibility was a crucial factor for the jury in reaching its verdict. Accordingly, any evidence tending to cast doubt on her credibility was highly relevant to Tuma's claim that L.S. was fabricating the charges and that he did not commit the offenses. The Commonwealth's failure to provide defense counsel with the recording prevented Tuma from being able to effectively cross-examine the child. "A factor in determining the materiality of undisclosed information is '[a]ny adverse effect that the prosecutor's failure to respond might have had on the preparation and presentation of the defendant's case.'" White v. Commonwealth, 12 Va. App. 99, 103, 402 S.E.2d 692, 695 (quoting Bagley, 473 U.S. at 683), aff'd on reh'g en banc, 13 Va. App. 284, 410 S.E.2d 412 (1991).

Regarding the victim's testimony, Tuma asserts her original statement contradicted her trial testimony in six separate areas: 1) how many times the abuse occurred, 2) the location where the abuse occurred, 3) her statement in the interview that no abuse occurred at the Green Acres trailer park, 4) whether her mother was present when the abuse occurred, 5) where in the house the abuse occurred, and 6) whether the victim inappropriately touched her brother at Tuma's request.

In the recorded statement, L.S. said she was abused more than five times but less than ten times when she was at the "white house." At trial, she initially stated she was abused "a lot" at the house and on cross-examination stated it was more than ten times. L.S. also recounted at trial other places where the abuse occurred, including her grandmother's house and a recreational vehicle park. She made no mention of abuse occurring at the other locations in the recorded statement.

In the initial interview, L.S. indicated her mother would go "out grocery shopping sometimes" when the abused occurred. At trial, she testified her mother was in the room while Tuma watched pornographic movies with her, but that her mother was not in the room when the abuse actually occurred. On the tape, L.S. stated the abuse occurred only in Tuma's bedroom. At trial, she testified the abuse occurred both in Tuma's bedroom as well as in her own bedroom, but indicated she was "usually" in Tuma's room when it happened. At trial, L.S. testified Tuma forced her to touch her younger brother in the bath. On the tape, she made no mention of the incident.

> In determining the question of materiality, we consider the suppressed evidence as a whole, not item by item and if a Brady violation is established, we do not engage in a harmless error review. Instead, a "constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial."

Teleguz v. Commonwealth, 273 Va. 458, 488, 643 S.E.2d 708, 727 (2007) (quoting Bagley, 473 U.S. at 678) (citations omitted).

Although the Commonwealth asserts the prior statement was not contradictory, but "merely different," it still could have been used for impeachment purposes. "'[W]itnesses [can] be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.'" Jones v. Commonwealth, 50 Va. App. 437, 447, 650 S.E.2d 859, 864 (2007) (quoting Jenkins v. Anderson, 447 U.S. 231, 239 (1980)). Additionally, even if, as the Commonwealth contends, the differences between the statements can be explained by the expert testimony that child victims commonly provide greater details of abuse as they become more comfortable with a counselor or advisor, whether to accept the explanation and believe L.S.'s trial testimony "was wholly within the province of the jury." Keener v. Commonwealth, 8 Va. App. 208, 214, 380 S.E.2d 21, 25 (1989). Credibility was the singular decisive issue in the case. The Commonwealth's failure to disclose the recorded statement precluded Tuma from

presenting the prior inconsistent statement to the jury, and "prevented [him] from effectively using the [statements] for purposes of challenging [L.S.'s] credibility." Bowman v. Commonwealth, 248 Va. 130, 134, 445 S.E.2d 110, 112 (1994). "When the 'reliability of a given witness may well be determinative of guilt or innocence,' evidence affecting the credibility of that witness should not be concealed by the prosecution." Burrows v. Commonwealth, 17 Va. App. 469, 472, 438 S.E.2d 300, 303 (1993) (quoting Napue v. Illinois, 360 U.S. 264, 269 (1959)).

In Lockhart, this Court concluded the suppressed impeachment evidence was not material because "the victim was subjected at trial to substantial impeachment on the details of his story." Lockhart, 34 Va. App. at 346, 542 S.E.2d at 9. In that case, "the victim's credibility would not have been damaged by the additional impeachment evidence any more than it already had been damaged at trial, particularly because the suppressed evidence was of no more significant nature than the impeachment evidence already presented at trial." Id. In this case, on the other hand, L.S. was not impeached at trial at all and was not confronted with any prior statements. Accordingly, we cannot conclude, as we did in Lockhart, that the suppressed impeachment evidence was merely cumulative and therefore immaterial. Instead, the recording represents the only evidence defense counsel could have used to impeach the victim's testimony. The jury's findings depended entirely upon L.S.'s credibility as there was no physical or other corroborating evidence presented at trial. Accordingly, L.S.'s pretrial statements would have been critical to evaluating her credibility and the Commonwealth's failure to provide defense counsel with the recorded statement prevented counsel from impeaching the witness. The recording of the victim's initial interview was relevant and material to determining the victim's credibility and was, therefore, useful to Tuma's ability to impeach the victim's credibility. In a case such as this where credibility is the most important issue, the withholding of the prior statement deprived

Tuma of his due process right to a fair trial and warrants a reversal of his convictions as the suppression of this evidence "'undermines confidence in the outcome of the trial.'" Teleguz, 273 Va. at 488, 643 S.E.2d at 727 (quoting Bagley, 473 U.S. at 678).

II.

Tuma also argues the trial court erred by refusing to allow the jury to hear the tape recording of the interview with the victim. Specifically, he asserts "[t]he audio tape recording was clearly relevant and the court abused its discretion and committed error by not introducing it."

Because we reverse the convictions on the grounds that the evidence should have been disclosed to the defense prior to trial, and the issue of whether the tape, which had not been heard by either the defense or the Commonwealth at the time of the trial, should have been admitted into evidence will not arise at a new trial, we do not address this issue in this opinion. See, for example, 1924 Leonard Road, L.L.C. v. Van Roekel, 272 Va. 543, 559, 636 S.E.2d 378, 387 (2006); Bellfield v. Commonwealth, 11 Va. App. 310, 316, 398 S.E.2d 90, 93 (1990).

For the reasons stated, the judgment appealed from will be reversed, and the case remanded to the trial court for such further proceedings as the Commonwealth may be advised, not inconsistent with this opinion.

Reversed and remanded.

Beales, J., dissenting.

I respectfully dissent. The United States Supreme Court has explained that a defendant "'is entitled to a fair trial but not a perfect one,' for there are no perfect trials." Brown v. United States, 411 U.S. 223, 231-32 (1973) (quoting Bruton v. United States, 391 U.S. 123, 135 (1968)); see Blevins v. Commonwealth, 267 Va. 291, 297, 590 S.E.2d 365, 369 (2004). Thus, the Supreme Court's decision in Brady v. Maryland, 373 U.S. 83 (1963), reflects that a defendant in a criminal prosecution is entitled to "a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 433-34 (1995).

Here, the tape recording of L.S.'s February 6, 2008 interview should have been provided to the defense prior to trial.[2] After reviewing the entire record in this case, however, I simply do not believe that "there is a reasonable probability that, had th[is] evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985); Bly v. Commonwealth, 280 Va. 656, 662, 702 S.E.2d 120, 123 (2010). Therefore, in my view, appellant received a fair trial under the standard that has been set forth by the United States Supreme Court and the Supreme Court of Virginia, and, thus, appellant's convictions should be affirmed.

I. THE BRADY TEST

As the United States Supreme Court has stated, "[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the

---

[2] The Supreme Court of Virginia has explained that the prosecution has a duty to disclose evidence favorable to the accused even though there has been no request by the accused – and that this duty encompasses impeachment evidence as well as exculpatory evidence. Workman v. Commonwealth, 272 Va. 633, 644, 636 S.E.2d 368, 374 (2006) (citations omitted). Here, appellant's counsel zealously attempted to obtain, and eventually did obtain, the tape recording of the February 6, 2008 interview after he learned of its existence at trial. However, as the tape recording of the February 6, 2008 interview with L.S. contains potential impeachment evidence, it really should have been disclosed to appellant's counsel prior to trial.

defense." Kyles, 514 U.S. at 436-37.  In Workman v. Commonwealth, 272 Va. 633, 644-45, 636

S.E.2d 368, 374 (2006), the Supreme Court of Virginia recognized

> three components of a violation of the rule of disclosure first
> enunciated in Brady: a) The evidence not disclosed to the accused
> "must be favorable to the accused, either because it is
> exculpatory," or because it may be used for impeachment; b) the
> evidence not disclosed must have been withheld by the
> Commonwealth either willfully or inadvertently; and c) the
> accused must have been prejudiced.

Id. (quoting Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).  "'[A] constitutional error occurs,

and the conviction must be reversed, only if the evidence is material in the sense that its

suppression undermines confidence in the outcome of the trial.'"  Id. at 645, 636 S.E.2d at

374-75 (quoting Bagley, 473 U.S. at 678); see Strickler, 527 U.S. at 280 ("'[T]he suppression by

the prosecution of evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution.'" (quoting Brady, 373 U.S. at 87)).

## II. BACKGROUND

Here, appellant was charged with one count of taking indecent liberties with a child

(L.S.), one count of aggravated sexual battery, and one count of animate object sexual

penetration.  The indictments alleged that these offenses occurred between January 1, 2006 and

December 31, 2007.  The Commonwealth's response to appellant's motion for a bill of

particulars alleged that appellant committed criminal acts at two locations – a residence at 9617

Boydton Plank Road and at a home in the Green Acres Trailer Park.

In addition, prior to trial, the Commonwealth provided the defense with a written

summary of L.S.'s interview with a child protective services officer and a police officer on

February 6, 2008.  According to this written summary, L.S. alleged, *inter alia*, that appellant had

been inappropriately touching L.S. and putting his finger in her vagina since she was four years

old; that appellant had touched L.S. in this way "at a white house with horses inside of a fence"; that appellant had touched her in this way five to ten times at the "white house"; and that the last time appellant touched her was in December 2007, at a home of a family friend. The written summary indicated that the "white house" was the residence at 9617 Boydton Plank Road and that the friend's home was inside Green Acres Trailer Park – which were both mentioned in the Commonwealth's response to the motion for a bill of particulars.

At trial, L.S. testified that the sexual abuse occurred at four different locations – at the "white house," at the Green Acres trailer, at her grandmother's house, and at an R.V. park.

### III. NO PREJUDICE UNDER BRADY IN THIS CASE

On appeal, appellant contends that he was prejudiced under Brady by the Commonwealth's failure to provide the defense, prior to trial, with the tape recording of the February 6, 2008 interview with L.S. Appellant claims that the tape recording of the February 6, 2008 interview contains significantly different allegations from what was provided in the written summary of the interview and also differed significantly from L.S.'s testimony at trial. Appellant argues that the Commonwealth's failure to provide the tape recording impeded his ability to conduct an effective cross-examination and now undermines such confidence in the verdict that he is entitled to relief under Brady. Although appellant raises several different assertions in support of this Brady claim,[3] his argument essentially boils down to L.S.'s statement during the middle of the interview that the sexual abuse occurred *only* at the "white house" – 9617 Boydton Plank Road – and not anywhere else. The written summary of the interview did not include this statement, but instead noted L.S.'s statement that the last incident

---

[3] Although Brady evidence must be "considered collectively, not item by item," Kyles, 514 U.S. at 436, all of the other alleged inconsistencies are either very minor or do not directly relate to the credibility of L.S.'s allegation that appellant actually committed the criminal acts charged in the indictments. Therefore, I would hold that these other alleged inconsistencies certainly are not "material" under Brady.

of sexual abuse occurred at the Green Acres Trailer Park – while, at trial, L.S. testified that the sexual abuse occurred at four different locations.

"[T]he burden is on appellant to show that the trial court erred.'" Gagelonia v. Commonwealth, 52 Va. App. 99, 112, 661 S.E.2d 502, 509 (2008) (quoting Galbraith v. Commonwealth, 18 Va. App. 734, 739, 446 S.E.2d 633, 637 (1994)). On appeal, appellant must demonstrate that the tape recording of the February 6, 2008 interview was "material" in the Brady sense by establishing that the contents of the tape recording "'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" Strickler, 527 U.S. at 290 (quoting Kyles, 514 U.S. at 435). "The materiality inquiry is a context-specific determination; evidence that is material in one setting could be immaterial in another." Lockhart v. Commonwealth, 34 Va. App. 329, 346, 542 S.E.2d 1, 9 (2001). In my view, under the particular circumstances of this case, I believe that appellant has not met the materiality requirement under Brady.

A.  L.S.'S CONSISTENT ALLEGATION OF SEXUAL ABUSE AT THE "WHITE HOUSE"

In this case, it is especially important to emphasize that L.S. has *always* been consistent in her allegation – both in the interview before trial and during her testimony at trial – that appellant sexually abused her at the "white house." Some of the details of L.S.'s allegation of sexual abuse have differed, but L.S. has *always* alleged that appellant sexually abused her at the "white house."

Thus, while the defense could perhaps have attempted to impeach L.S. to some extent if it had known that she stated during a portion of the tape-recorded interview that the sexual abuse occurred only at the "white house," the jury was always entitled to disbelieve parts of L.S.'s testimony while at the same time accepting her *consistent* allegation that appellant indeed sexually abused her (and committed the charged offenses) at the "white house." See Rollston v.

Commonwealth, 11 Va. App. 535, 547, 399 S.E.2d 823, 830 (1991). The jury's acceptance of L.S.'s testimony, standing alone, that the charged offenses occurred at the "white house" would support the guilty verdicts in this case. See Fisher v. Commonwealth, 228 Va. 296, 299, 321 S.E.2d 202, 204 (1984) (noting that "the victim's testimony, if credible and accepted by the finder of fact, is sufficient evidence, standing alone, to support the conviction" in a rape or sexual abuse case).

## B. L.S. DID ALLEGE SEXUAL ABUSE AT THE GREEN ACRES TRAILER PARK

Furthermore, the written summary of the February 6, 2008 interview *correctly* states that L.S. indicated the last incident of sexual abuse occurred at the Green Acres Trailer Park. While L.S. said during the middle of the tape-recorded interview that the sexual abuse only occurred at the "white house" (and not anywhere else), she apparently added a correction to this statement later in the interview. Near the very end of the tape-recorded interview, L.S. was asked when was the last time that appellant touched her sexually. The transcript of the interview indicates that the "tape ran out" while L.S. was answering this question. At the point that the tape cut off, L.S. was in the middle of stating that the last time appellant touched her sexually "was when I was like living with . . . ."

The written summary of the interview (which was provided to the defense prior to trial) indicates that L.S. then alleged that appellant touched her sexually at the home of the family friend – in the Green Acres Trailer Park. The allegation that appellant committed criminal acts at the Green Acres Trailer Park, of course, had already been provided to the defense in the Commonwealth's response to the motion for a bill of particulars – further corroborating the Commonwealth's explanation that L.S. mentioned a second location of sexual abuse immediately after the tape recording of the February 6, 2008 interview "ran out."

- 13 -

C. THE DEFENSE COULD HAVE ALREADY IMPEACHED L.S. BASED ON DIFFERENCES BETWEEN THE WRITTEN SUMMARY OF HER INTERVIEW AND HER TRIAL TESTIMONY

Even if the defense had been aware that L.S. said during *the middle* of the February 6, 2008 tape-recorded interview that the sexual abuse occurred only at the "white house" (and not anywhere else), there is not "a *reasonable probability* that, had th[is] evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682 (emphasis added). This is because, prior to trial, the defense was already aware that L.S. alleged during this interview that the sexual abuse occurred at *two* locations – at the "white house" and at the Green Acres Trailer Park. At trial, however, L.S. alleged that appellant sexually abused her at *four* locations – at the "white house," at the Green Acres trailer, at her grandmother's house, and at an R.V. park.

Thus, the defense was already aware of an inconsistency in L.S.'s statements concerning the locations of the sexual abuse – and certainly *could have* attempted to impeach L.S.'s credibility on that basis. Whether L.S. alleged earlier that the sexual abuse occurred at one *or* two locations simply is not material in the Brady sense, given that L.S. mentioned *two entirely new locations of abuse* for the first time at trial. Since the defense was aware prior to trial that L.S. had alleged during the February 6, 2008 interview that the sexual abuse occurred at two locations and L.S. then testified at trial that the sexual abuse occurred at four locations, L.S.'s statement earlier in the February 6, 2008 interview that the abuse occurred only at one location is essentially the "same type" of impeachment evidence that was already at the defense's disposal. Lockhart, 34 Va. App. at 346, 542 S.E.2d at 9. Disclosure of this statement by L.S. would not,

- 14 -

therefore, "have put the whole case in such a different light as to undermine confidence in the verdict." Id.[4]

Unlike in Bly, 280 Va. at 663, 702 S.E.2d at 124, no previously undisclosed impeachment evidence could have led to significantly more "devastating impeachment" of L.S.'s credibility in this case.[5] For example, L.S. made no statements during the tape-recorded February 6, 2008 interview that pointed to a motive to fabricate her allegation of sexual abuse by appellant or that could have rendered her allegation improbable. Instead, the entirety of this interview reveals comparatively minor differences from the information that was already disclosed to the defense prior to trial. There is only a "'mere possibility,'" at most, that disclosure of the tape recording of the February 6, 2008 interview might have helped the defense any more than the written summary of the interview. Soering v. Deeds, 255 Va. 457, 465, 499 S.E.2d 514, 519 (1998) (quoting United States v. Agurs, 427 U.S. 97, 109 (1976)). And, of course, as the United States Supreme Court has instructed us, "'[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the

---

[4] In addition, L.S.'s child counselor – who was admitted as an expert in adolescent trauma – testified at trial that it is uncommon for children "to remember specific dates and instances of sexual abuse" because "they try to repress that as much as possible." The expert also testified that it is common "for more information to come out" after a young victim of sexual abuse begins therapy.

[5] In Bly, the Commonwealth relied on a confidential informant's testimony about two alleged drug transactions with Bly to prove Bly's guilt at trial – but the Commonwealth did not disclose to the defense that the police were aware that the confidential informant had been providing false accounts of controlled transactions, was only paid by the authorities if he reported a drug transaction, and had reported a total of eighty-three controlled buys during a seven-month period. Bly, 280 Va. at 658-60, 702 S.E.2d at 121-22. On appeal, the Supreme Court held that the failure to disclose this impeachment evidence that "could have led to *a devastating impeachment*" of the confidential informant's credibility "undermines confidence in the outcome of the trial." Id. at 663, 702 S.E.2d at 124 (emphasis added).

- 15 -

outcome of the trial, does not establish "materiality" in the constitutional sense.'" Id. (quoting

Agurs, 427 U.S. at 109-10).

Accordingly, I would hold that appellant simply was not prejudiced under Brady.[6]

IV. CONCLUSION

Although the tape recording of L.S.'s interview should have been provided to the defense

prior to trial, the failure to do so, under these particular circumstances, does not establish the

required materiality in the constitutional sense. There was not much more or truly different

impeachment evidence that could be brought forward to impeach this seven-year-old child on

cross-examination that was not already available to the defense to provide to the factfinder, and

the victim here was *always* consistent that appellant sexually abused her at the "white house."

Appellant was not prejudiced in any material way under the standard set forth by the United

States Supreme Court in Brady and in Kyles and by the Supreme Court of Virginia in Workman.

Accordingly, since I believe appellant's "trial result[ed] in a verdict worthy of confidence,"

Kyles, 514 U.S. at 434, I respectfully dissent from the decision of the majority to reverse the

convictions in this case.

---

[6] I would also hold that the trial court did not abuse its discretion when it denied appellant's request to play the tape recording for the jury. "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Brown v. Commonwealth, 21 Va. App. 552, 555, 466 S.E.2d 116, 117 (1996). At the time of appellant's request, neither appellant's counsel nor the trial court had even heard the audio tape, which turned out to be of poor quality.